## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **VICTOR K. WILLIAMS;** ) | |
| **5209 Baltimore Ave** ) | |
| **Bethesda, MD  20816** ) | |
|   **Plaintiff,** ) | |
| ) | |
|   **v.** ) | |
| ) | |
| **JACOB J.  LEW,  in his official** ) | |
| **capacity as Secretary of the U.S.** ) | |
| **Department of the Treasury;** ) | Case No.  1:14-cv-00183(RJL) |
| **1500 Pennsylvania Avenue, N.W.** ) | |
| **Washington, DC 20220** ) | |
| ) | |
|   **and** ) | |
| ) | |
| **U.S. DEPARTMENT OF THE** ) | |
| **TREASURY;** ) | |
| **1500 Pennsylvania Avenue, N.W.** ) | |
| **Washington, DC 20220** ) | |
|   **Defendants** ) | |

---

### FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
### TO VOID THE DEBT CEILING

### INTRODUCTION

1. Plaintiff Victor Williams purchased and holds a variety of Treasury-issued bonds, notes, and bills.  Plaintiff asks this Court for a declaratory judgment that the federal debt ceiling, 31 U.S.C. §3101, is unconstitutional and void.  The debt ceiling does exactly what the Constitution explicitly prohibits; it questions the "validity of the public debt of the United States." U.S. Const. amend. XIV, § 4.  Plaintiff holds his nation's debt under a constitutional guarantee *not only* that his Treasury debt instruments will remain valid, *but also* that the "validity" of those securities will not be "questioned" by his nation's government.  The debt

ceiling facially breaches that constitutional guarantee, and its contemporary operation threatens Defendants' arbitrary default on Plaintiff's securities together with all other public debt and government obligations.

2.     The statute's constitutional violation is patent; "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 687 (J. Scalia, dissenting).  As with Tiberius' "holding a wolf by the ears," the national government and Treasury debt holders alike have come to fear the "catastrophic" consequences of the statute's enforcement.  The statute's perverse effects on the congressional budgeting process are equally obvious.  *See Repeal the Debt Ceiling: The Borrowing Limit Has Become a Tool to Increase Spending,* , WALL ST. J.,  Feb. 11, 2014, available at

http://online.wsj.com/news/articles/SB10001424052702304104504579377303355489512.

Although the statute's unconstitutionality has been widely referenced during recent years' political conflict regarding the inevitable need to raise the debt limit, Plaintiff knows of no other party who has attempted to adjudicate the statute's invalidity.

3.     The 2013 partisan battle regarding raising the debt ceiling limit and the resulting legislation authorizing a fifteen-week suspension made further manifest the statute's unconstitutionality.  Indeed, the Section 1002(a) Short Title of the suspension legislation -- "*Default Prevention Act of 2013*" -- evidences that the debt ceiling's normal operations constantly threaten fiscal default.  Even before the suspension expired on February 7, 2014, Defendant Lew again resorted to "extraordinary measures," attempting to further delay a "catastrophic" default.

4.     In mid-February, 2014, Congress extended the debt ceiling's suspension until March 16, 2015.  This most recent legislative provision carries the formal Short Title --

"*Temporary Debt Limit Extension Act,*" giving notice that the default reprieve is purposely transient.  Language in the 2014 suspension legislation also explicitly restricts the Defendants from taking certain preemptive measures to avoid default in future.  Section 3 of the amendment (styled "*Restoring Congressional Authority Over the National Debt*") prohibits Treasury from prepaying obligations and/or building a "cash balance above normal operating balances in anticipation of the expiration of such period." Pub. L.  No: 113-83; S-540.  The suspension thus envisions an eventual default scenario at the time of its expiration.  While temporally suspended, the debt ceiling statute remains an unconstitutional exercise of legislative authority.  In both its text and intended operation, the statute always questions the validity of the public debt.

5.      As have scores of generations of Americans, proudly during peaceful times and humbly during times of war, Plaintiff holds a very modest amount of his nation's debt.  Plaintiff holds these Treasury securities remembering, as our first Treasury Secretary Alexander Hamilton said in 1790, "United States debt, foreign and domestic, was the price of liberty." Adam Hodge, *Remembering the Fathers of the Treasury*, June 16, 2013, *available at* http://www.treasury.gov/connect/blog/Pages/remembering-_fathers.aspx.  The credit afforded the government's balance sheet allows his nation -- especially in times of severe budget deficits due to contracting private sector growth -- to meet its other vested debt obligations (e.g., Social Security, Medicare, Medicaid, and veterans' pensions) and continue its other basic government operations (e.g., regulations, defense, infrastructure,  and federal courts/justice).

6.      The congressional authors of the Fourteenth Amendment's Public Debt Clause were resolute in intending "to lay down a constitutional canon for all time in order to protect and maintain the national honor and to strengthen the national credit." Phanor J. Eder, *A Forgotten Section of the Fourteenth Amendment*, 19 CORNELL L.Q. 1, 15 (1933).  The full text of Section 4 is instructive in its broad reference of an assurance for all public debt:

The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned.  But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

U.S. Const. amend. XIV, § 4.

7.      Professor Jack Balkin connects the Fourteenth Amendment's drafting history and text to its contemporary relevance: "Section 4 targets the worry that, once fully readmitted to the Union, senators and representatives from Southern states ... would deliberately refuse to repay debts incurred in suppressing the confederate rebellion."  Professor Balkin further explains:

> [T]he language of the Amendment went beyond this particular historical concern. It was stated in broad terms in order to prevent future majorities in Congress from repudiating the federal debt to gain political advantage, to seek political revenge, or to try to disavow previous financial obligations because of changed policy priorities."

Jack Balkin, *The Legislative History of Section Four of the Fourteenth Amendment,* BALKINIZATION.COM, June 30, 2011, *available at* http://balkin.blogspot.com/2011/06/legislative-history-of-section-four-of.html.

8.      The contemporary authority of Section Four is best understood by its full, weighty post-bellum context.  It joins other broadly-stated provisions of the Thirteen, Fourteenth and Fifteenth Amendments in their sweeping language abolishing slavery, ensuring equal protection of the laws, and charging national protection of the right to vote.  Section Four fundamentally alters the 1787 Charter's political/economic order. *See* BRUCE A. ACKERMAN, WE THE PEOPLE:  TRANSFORMATIONS 230-34 (1998).  At a minimum, Section Four of the Fourteenth Amendment further restricts the national legislature's already limited authority.  As John Marshall reminded in 1803: "The powers of the legislature are defined and limited; and that those

limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 5 U.S. 137, 176 (1803).

      9.      The Supreme Court in *Perry v. Unites States* ruled that Section Four of the Fourteenth Amendment explicitly further restricts Congress' authority when borrowing money "on the credit of the United States" by assuring that it will never so much as "question" the validity of public debt obligations:

> By virtue of the power to borrow money 'on the credit of the United States,' Congress is authorized to pledge that credit as assurance of payment as stipulated – as the highest assurance the Government can give – its plighted faith. To say that Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and conveniences of the pledgor.

294 U.S. 330, 352 (1935).  Neither may Congress -- by such questioning -- violate an individual's due process rights by arbitrarily casting doubt upon, interfering with, or threatening to devalue the interests of, private parties who hold Treasury securities:

> There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements when it has borrowed money under the authority which the Constitution confers.

*Id.* at 350-51.

      10.      The textual analysis, drafting history, and functional purpose of Section Four of the Fourteenth Amendment prove that its scope is broad and its proscription absolute.  The prohibited government action need not rise to a formal "repudiation" of the legal obligation to repay a debt, to an actual "default" based on a refusal to pay, or even to an anticipatory default based on an inability to timely pay back.  Rather, the Constitution sets an even higher assurance for holders of its debt obligations – public debt protection is triggered by the government's mere questioning or impugning its debt obligations.

11.     While Treasury-issued public debt is the particular type of obligation at issue in the present case, Plaintiff asserts that the Fourteenth Amendment guarantees a broader range of obligations than just Treasury bonds, notes, and bills.  Once any type of federal fiscal obligation becomes due, the Prompt Payment Act categorizes it as a type of "debt." 31 U.S.C. 3901 *et seq*. Professor Neil Buchanan describes how the payment legislation requires that all unpaid obligations formally be labeled and treated as debt:

> [The Prompt Payment Act] actually uses the word "debt" to describe the unpaid obligations on which interest must be paid.  Section 3902(e) states: "An amount of an interest penalty unpaid after any 30-day period shall be added to the principal amount of the *debt*, and a penalty accrues thereafter on the added amount" (emphasis added).  That is, as soon as the obligation is unpaid, it becomes a debt upon which interest is owed; and if the interest is unpaid for thirty days, that interest becomes part of the debt, too.  Federal law, therefore, not only treats obligations as the equivalent of debts on the date that they are due, but it even calls them debts.

Neil Buchanan, *The Prompt Payment Act, the Meaning of Obligations and Debts, and Default*, DORFONLAW.ORG, Sept. 27, 2013, available at http://www.dorflaw.org/2013/09/the-prompt-payment-act-meaning-of.html.

### *PERRY V. UNITED STATES*:
### "WHATEVER CONCERNS THE INTEGRITY OF THE PUBLIC OBLIGATONS"

12.     As noted above, the Supreme Court in *Perry v. United States* declared that the Fourteenth Amendment explicitly limits Congress' authority by restricting it from calling into question the validity of public debt obligations.  Neither may Congress violate individual due process rights by interfering with, or devaluing the interests of, private parties who hold Treasury securities. 294 U.S. 330, 350-52 (1935).

13.     The high court in *Perry* explicitly rejected "sovereign immunity" as a justification for congressional interference with the bondholder's rights, stating: "Having this

power to authorize the issue of definite obligations for the payment of money borrowed, the

Congress has not been vested with authority to alter or destroy those obligations." *Id.* at 353-54.

14.     In contrast to modern commentators attempting to minimize the breadth of the

Constitution's Public Debt Clause protections by emphasizing its unique post-bellum history,

Chief Justice Hughes wrote:

> While this provision was undoubtedly inspired by the desire to put beyond
> question the obligations of the government issued during the Civil War, its
> language indicates a broader connotation.  We regard it as confirmatory of a
> fundamental principle which applies as well to the government bonds in question,
> and to others duly authorized by the Congress, as to those issued before the
> amendment was adopted.

*Id.* at 354.

15.     When applying *Perry* to the instant claim, this Court should examine the work

of commentators who understand that Section Four of the Fourteenth Amendment was drafted,

passed, and ratified to "prevent precisely the abuses" of the present debt ceiling's operations.  As

Princeton University's Sean Wilentz has written:

> As the wording of the amendment evolved during the Congressional debate, the
> principle of the debt's inviolability became a general proposition, applicable not
> just to the Civil War debt but to all future accrued debts of the United States.  The
> Republican Senate leader, Benjamin F. Wade of Ohio, declared that by placing the
> debt "under the guardianship of the Constitution," investors would be spared from
> being "subject to the varying majorities which may arise in Congress."
> Two years later, on the verge of the amendment's ratification, its champions inside
> the Republican Party made their intentions absolutely clear, proclaiming in their
> 1868 party platform that "national honor requires the payment of the public
> indebtedness in the utmost good faith to all creditors at home and abroad," and
> pronouncing any repudiation of the debt "a national crime."

Sean Wilentz, *Obama and the Debt*, N.Y. TIMES, Oct. 7, 2013 at A27. *See also,* Garrett Epps,

*The Constitution's Latest Blaze of Notoriety: Bad for the Republic*, ATLANTIC, June 30, 2011,

*available at* http://www.theatlantic.com/national/archive/2011/06/the-constitutions-latest-blaze-

of-notoriety-bad-for-the-republic/241308/.

16.     In commentary specifically addressing whether the Executive could or should independently invoke the Public Debt Clause to "ignore" the debt ceiling, some attempt to minimize *Perry*'s authority as "plurality dictum." Laurence H. Tribe, *A Debt Ceiling We Can't Wish Away*, N.Y. TIMES, July 8, 2011, at A23.  Yet the importance and breadth of *Perry*'s authority and power has long been analogized to that of *Marbury v. Madison.* 5 U.S. 137 (1803). Recent scholarship has refreshed this known comparison of *Perry* and *Marbury*, noting the foundational nature of their constitutional jurisprudence and that the two opinions share a "rights-remedy gap." *See e.g.,* Gerard N. Magliocca, *The Gold Clause Cases and Constitutional Necessity*, 64 FLA. L. REV. 1243, 165-68 (2012)(quoting Arthur M. Schlesinger, who described *Perry* as a "masterpiece of judicial legerdemain hardly matched in the annals of the Court since Marshall's opinion in *Marbury v. Madison*").

17.     In *Perry*, the Supreme Court established an expansive scope for the Public Debt Clause's proscription: "Nor can we perceive any reason for not considering the expression 'the validity of the public debt' as embracing whatever concerns the integrity of the public obligations." *Perry*, 294 U.S. at 354.  The Perry Court's focus on "integrity" supports Plaintiff's assertion of the facial and operations invalidity of the debt ceiling statute.

## DEBT CEILING STATUTE QUESTIONS VALIDITY OF PUBLIC DEBT AND THREATENS ACTUAL DEFAULT

18.     On its face, the debt ceiling statute violates the Fourteenth Amendment's Public Debt Clause and casts doubt on the creditworthiness of the United States to honor Plaintiff's debt.  In actual operation, the statute also violates the Fifth Amendment's Due Process Clause by its arbitrary harm against Plaintiff – while also threatening unknown collateral domestic and global economic disaster.

19.      During the 2013 partisan conflict (within and between the congressional houses
and between the Congress and the Executive) that resulted in the 2013 Default Prevention Act,
Defendants issued a report detailing the "catastrophic" harm that Treasury's enforcement of the
debt ceiling threatens:

> Today, the U.S. Department of the Treasury released a report on the potential
> macroeconomic effects of debt ceiling brinksmanship.  The report states that a
> default would be unprecedented and has the potential to be catastrophic: credit
> markets could freeze, the value of the dollar could plummet, and U.S. interest rates
> could skyrocket, potentially resulting in a financial crisis and recession that could
> echo the events of 2008 or worse.

Sabrina Siddiqui, *Report on Macroeconomic Effect of Debt Ceiling Brinkmanship,* Oct. 3, 2013*,
available at* http://www.treasury.gov/connect/blog/Pages/Report-on-Macroeconomic-Effect-of-
Debt-Ceiling-Brinkmanship.aspx.

20.      In October 2013, Defendant Lew stated that the debt ceiling had been reached
some months prior and that he would soon exhaust all "extraordinary" accounting measures he
had available to continue financing the government. *Transcript of Interview on CNN's State of
the Union with Candy Crowley*, Oct. 6, 2013, *available at*
http://cnnpressroom.blogs.cnn.com/2013/10/06/lew-congress-is-playing-with-fire-on-debt-
ceiling/.  Lew averred that, soon after October 17, 2013, the government would enter a fiscal
"default" with insufficient incoming revenues to cover outgoing payment obligations. *Id.*  There
were no "magic" options of minting possible platinum coins or fire sales of financial assets
sufficient to avoid fiscal "default." *Id.*  Defendant Lew stated that, as the debt ceiling prevented
him from additional borrowing as needed, a historic "default" could not be avoided: "There is no
option that prevents us from being in default if we don't have enough cash to pay our bills." *Id.*
Lew framed the matter as both domestic and global: "These are commitments that Congress
made.  It's paying old bills.  It would be like somebody saying I ran up my credit card and I

decided not to pay it.  You can't do that.  The United States is just too important to the world.

Our currency is the world's reserve currency." *Id.*

21.     Independent organizations, such as the Bipartisan Policy Committee, confirmed

that a debt-ceiling caused "default" was highly probable by October's end, and a certainty by

November 15, 2013. *See* Shai Akabas, Brian Collins and Steve Bell, *As BPC's X Date Window*

*Narrows, Economic Risks Grow*, BIPARTISANPOLICY.COM, Oct. 8, 2013, *available at*

http://bipartisanpolicy.org/blog/2013/10/08/bpc%E2%80%99s-x-date-window-narrows-

economic-risks-grow.

22.     In October 10, 2013, testimony before the Senate Finance Committee,

Defendant Lew stated that he could not give public debt holders assurance that they would be

timely paid principal or interest.  His message was unequivocal: "This brinksmanship threatens

the holders of government bonds and those who rely on Social Security and Veterans benefits."

*The Debt Limit, Hearings Before the Senate Committee on Finance*, 113th Cong. (2013)

(testimony of The Honorable Jacob J. Lew, Secretary, United States Department of the

Treasury), *available at*  http://www.finance.senate.gov/hearings/hearing/?id=cb3ca699-5056-

a032-52fb-9f23396c3f7c.

23.     Senator Pat Toomey asked Lew whether the Treasury-issued debt was being

questioned: "Are you prepared to assure us, but more importantly, the millions of Americans

who are investors in U.S. Treasury securities and the entire American economy, that under no

circumstances will you permit a missed payment on a U.S. Treasury security obligation?" *Id.*

Lew refused to give Plaintiff or other Treasury debt holders any such assurances, but rather,

stated that "the only way to make sure we can pay all of our obligations is for Congress to act

and raise the debt limit." *Id.*

24.       In Senate testimony Lew detailed the irrationality of suggestions that Treasury could prioritize its millions of automated daily payments: "This system was not designed to be turned off selectively.  Anyone who thinks it can be done just doesn't know the architecture of our payment system." *Id.*  Describing a circumstance in which the debt ceiling was fully breached, Lew stated: "It would be chaos" and "the options are all bad." *Id.*  Defendant Lew further explained:

> The legal issues even regarding interest and principle [*sic*] on the debt are complicated.  Let me remind everyone, principle [*sic*] on the debt is not something we pay out of our cash flow of revenues.  Principle [*sic*] on the debt is something that is a function of the market's rolling over.  So there's a question of what we can do as a government and how the markets function when the government is failing to pay all of its bills.  We've never been there and I think anyone who suggests they know exactly what that means would be projecting after 224 years of the history of paying all of our bills, what happens if we stop paying all of our bills.

*Id.*

25.       During the Senate hearings, Senator Toomey stated that he was "shocked" and "extremely disappointed" that Lew would not assure Treasury debt holders that they "don't have to worry about the security of their Treasuries." *Id.*  Although Senator Toomey expressed shock, he should not have been surprised, as Toomey has repeatedly introduced (and failed to pass) legislation attempting to authorize and require Treasury debt payment prioritization in the event of a debt ceiling default.

26.       In recent commentary raising the relevance of the Prompt Payment Act, referenced above, Professor Neil Buchanan helps explain the reason that Defendants consistently maintain that Treasury cannot prioritize its payments:

> Part of the reason that Treasury has rejected the broad suggestion that they can prioritize all spending…is that they are required by law to make payments on a day-to-day basis.  That is, even if they wanted to hold off on paying a lower-priority obligation that is due today, in anticipation of a higher-priority obligation that will be due tomorrow, they are required by law to pay for every obligation for which money is available, every day.  The relevant statute is the Prompt Payment Act, 31 U.S.C. 3901 *et seq.*

Neil Buchanan, *The Prompt Payment Act, the Meaning of Obligations and Debts, and Default*, DORFONLAW.ORG, Sept. 27, 2013, available at http://www.dorfonlaw.org/2013/09/the-prompt-payment-act-meaning-of.html.

27.     As long as the debt ceiling remains law, Plaintiff and all other Treasury bondholders do indeed "have to worry" about the validity of public debt obligations.  Indeed, the Defendant Treasury Department has consistently held the position that the Debt Ceiling statute threatened debt validity as prioritization of payment obligations is not possible. *See* Neal Wolin, *Treasury: Proposals to 'Prioritize' Payments on U.S. Debt Not Workable; Would Not Prevent Default,* January 21, 2011, *available at* http://www.treasury.gov/connect/blog/Pages/Proposals-to-Prioritize-Payments-on-US-Debt-Not-Workable-Would-Not-Prevent-Default.aspx.  In an April 2011 letter to Congress, during a prior debt-ceiling default crisis, then Treasury Secretary Timothy Geithner explained that default by the United States would be unavoidable: "Because of the magnitude of past commitments by Congress, immediate cuts in spending or tax increases cannot make the necessary cash available." *Letter from Timothy F. Geithner, Secretary of the Treasury, to the Hon. Harry Reid, Senate Majority Leader*, April 4, 2011, *available at* http://www.treasury.gov/connect/blog/Pages/letter-to-congress.aspx.

28.     The debt ceiling's operations cast grave doubt globally on the integrity and validity of our nation's Treasury debt.  During the 2013 default crisis, some of the largest investment houses openly eliminated their Treasury debt positions scheduled to mature in late October and November 2013.  Smaller banks and investment firms reportedly advised clients to sell short-term Treasury holdings.  On October 13, 2013, heads of the International Monetary Fund and the World Bank publically implored Congress to take urgent action to lift the debt ceiling, while warning that the projected default would result in global economic catastrophe.

Annie Lowrey and Nathaniel Popper, *World Leaders Press the U.S. on Fiscal Crisis*, N.Y. Times, Oct. 13, 2013, at A1.

29.     On October 15, 2013, interest rates on commercial interbank loans were lower than interest rates on Treasury bills.  For the first time in our nation's history (since such data has been collected and reported), the so-called "TED spread" turned negative, evidencing that debt market investors had more confidence in short-term commercial interbank loans than in the United States Treasury's short-term debt.  Also on October 15, 2013, a ratings firm, Fitch, placed the United States on a "Ratings Watch Negative," noting that the debt- ceiling crisis cast serious doubt on the creditworthiness of the United States. *See* Howard Schneider, *Default Averted This Time, But Standoffs Have Put the U.S. Credit Rating at Risk*, Wash. Post., Oct. 17, 2013 at A10. Fitch announced that the debt-ceiling crisis "risks undermining confidence in the role of the U.S. dollar as the preeminent global reserve currency, by casting doubt over the full faith and credit of the U.S." *Id.*

30.      By any measure, the marketplace in 2013 judged the validity of our nation's public debt to be at risk because of the debt ceiling.  The nation's largest banks took the October default threat quite seriously, committing extraordinary resources to plan for a default.  As reported in November, 2013: "As the United States threatened to default on its debt last month, major U.S. banks set up war rooms, spent many millions of dollars on contingency planning and, in some cases, even prepared to underwrite federal government benefits." David Henry and Lauren Tara LaCapra, *Insight: As U.S. Default Threatened, Banks Took Extraordinary Steps,* Reuters, Nov. 19, 2013, available at http://www.reuters.com/article/2013/11/19/us-usa-fiscal-banks-warrooms-insight-idUSBRE9AI05P20131119.

31.     Pursuant to the "Default Prevention Act of 2013," the debt ceiling was only suspended through February 7, 2014. *See* Continuing Appropriations Act, 2014, Pub. L. No.

113–46, 2013 H.R. 2275.  Beginning mid-November, 2013, Defendant Lew began warning that "[t]here really is no alternative but to raise the debt limit when you need to borrow in order to pay the bills."  Referencing payments for bonds, contacts, and entitlement benefits, Lew stated that debt-ceiling default threatened the "full faith and credit of the United States." Kasia Klimasinska & Ian Katz, *Lew Sees No Alternative to Congress Raising Debt Limit*, BLOOMBERG.COM, Nov. 19, 2013, *available at* http://www.bloomberg.com/news/2013-11-19/lew-sees-no-alternative-to-congress-raising-debt-limit-by-feb-7.html.

32.     On December 19, 2013, Defendant Lew wrote Congress to emphasize again the danger that a debt ceiling default poses:

> The creditworthiness of the United States is an essential underpinning of our strength as a nation; it is not a bargaining chip to be used for partisan political ends.  Moreover, as you know, increasing the debt limit does not authorize new spending commitments.  It simply allows the government to pay for expenditures Congress has already approved.
> The American public expects its leaders to put an end to governing by crisis and to focus on promoting economic growth and job creation.  I respectfully urge Congress to take action to raise the debt limit at the earliest possible moment and ideally well before February 7, 2014.

*Letter from Jacob Lew, Secretary of the Treasury, to the Hon. John A. Boehner, Speaker of the House*, December 19, 2013, *available at* http://www.treasury.gov/initiatives/Pages/debtlimit.aspx Lew warned that even by taking all available "emergency measures,"  "we would be able to extend the nation's borrowing authority only until late February or early March 2014." *Id.*

33.     A month later, Defendant Lew again wrote to Congress expressing increased concerns that Treasury is more likely to exhaust its resources in late February due to the tax refund season and because some of the extraordinary measures would not be available: "Protecting the full faith and credit of the United States is the responsibility of Congress, because only Congress can extend the nation's borrowing authority." *Letter from Jacob Lew, Secretary of the Treasury, to the Hon. John A. Boehner, Speaker of the House*, January 22, 2014, *available at*

http://www.treasury.gov/initiatives/Pages/debtlimit.aspx.  As of the last day of the suspension,

February 7, 2014, Congress had failed to act; Defendant Lew had already begun to exhaust

extraordinary measures.  Defendant Lew wrote Congress on February 7, 2014, to warn of an

impending default, and again on February 10, 2014, to warn of "catastrophic consequences" of

Congress' failure to timely act. *Letter from Jacob Lew, Secretary of the Treasury, to the Hon.*

*John A. Boehner, Speaker of the House*, February 10, 2013, available at

http://www.treasury.gov/initiatives/Pages/debtlimit.aspx.   As noted above, the February 15,

2014 amendment extending the temporary suspension until March 16, 2015 explicitly restricted

Defendants from taking certain measures that might help delay default in 2015. *See "Temporary*

*Debt Limit Extension Act,"* Pub. L.  No: 113-83; S-540.

## JURISDICTION, VENUE, AND RELIEF

34.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, as

this action arises under the U.S. Constitution, to challenge the federal debt ceiling statute seeking

declaratory and specific relief.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(e),

as this action is against the federal government.

35.      The relief requested is authorized pursuant to 28 U.S.C. § 2201 (declaratory

relief) and pursuant to 28 U.S.C. § 2202 (injunctive relief).  If the requested injunctive relief is

deemed by this Court to be an insufficient remedy, an alternative Writ of Mandamus request is

authorized pursuant to 28 U.S.C. § 1361.

## PARTIES/STANDING/JUSTICIABILITY

36.      Plaintiff Victor Williams is a United States, taxpayer-citizen who holds a very

modest amount of Treasury-issued public debt instruments of varied types and durations;

Plaintiff holds these securities trusting that such public debt is constitutionally guaranteed by the

United States of America.  Plaintiff brings this action solely as an individual with a residence

address of 5209 Baltimore Ave, Bethesda, MD 20816.  As a full-time member of a law faculty in the District of Columbia, Professor Williams' business address is Suite 480, Columbus School of Law, Catholic University of America, Washington, DC 20064.

37.     Defendant Jacob J. Lew ("Lew") is Secretary of the Treasury.  Lew is sued herein solely in his official capacity as the public official with control over the conduct of the Treasury Department and its Bureau of Fiscal Services with a business address at 1500 Pennsylvania Avenue, N.W., Washington, DC 20220.

38.     Defendant United States Department of the Treasury ("Treasury") is the administrative agency of the United States holding general fiscal responsibility, including for management of the Bureau of Fiscal Services, with a business address at 1500 Pennsylvania Avenue, N.W., Washington, DC 20220.

39.     The Plaintiff has standing to bring this action including as the purchaser and holder of United States public debt in the form of savings bonds and Treasury bills, notes, bonds, and TIPS of various durations (4-weeks, 13-weeks, 26-weeks, 52-week, 3-years, 5-years, 7-years, 30-years).  Plaintiff secured the holdings, directly from Defendants through their "TreasuryDirect.gov" website.   Plaintiff avers direct, individual, concrete, and certainly impending harm from the unconstitutional debt ceiling statute.

40.     This action is an individual rights claim that is fully justiciable. *See Marbury v. Madison*, 5 U.S. 137, 165-67 (1803).  Although "embarrassing confrontation[s] between coordinate branches' of the Federal Government" provides political context for understanding the individual rights violation, the claim's review does not ask a "political question" but rather "falls within the traditional role accorded courts to interpret the law." *Powell v. McCormack*, 395 U.S. 486, 548-49 (1969); s*ee Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S.Ct. 1421(2012); *see also,* Martin H. Redish, *Judicial Review and the 'Political Question*,' 79 Nw. U. L. Rev. 1031 (1985).

**CAUSE OF ACTION**

41.     Plaintiff repeats and re-alleges each of the foregoing allegations.

42.     Plaintiff seeks a declaratory judgment from this Court ruling that the statutory

debt ceiling, 31 U.S.C. 3101, is unconstitutional and void for the following reasons:

A.   The debt ceiling is in direct violation of Section Four of the Fourteenth

Amendment to the Constitution of the United States, which expressly limits the powers delegated

to Congress by the Constitution.  The Public Debt Clause command is clear: "The validity of the

public debt of the United States, authorized by law... shall not be questioned." U.S. Const.

amend. XIV, § 4.  Additionally, the invalid debt ceiling's contemporary operations and its

threatened arbitrary enforcement (Defendants do not have authorization or ability to prioritize

debt payments) violate Plaintiff's Fifth Amendment "due process" rights. U.S. Const. amend. V.

*See generally*, Michael Abramowicz, *Beyond Balanced Budgets, Fourteenth Amendment Style*,

33 TULSA L. J. 561 (1997) and  Stuart McCommas, *Forgotten But Not Lost: The Original Public*

*Meaning of Section 4 of the Fourteenth Amendment*,  99 VA. L. REV. 1291 (2013).

B.   To Plaintiff's concrete and certainly impending harm, the debt ceiling also

violates the Constitution's structural and functional separation of powers in preventing the

Executive from carrying out sworn Article II § 3 duties to "take Care that the Laws be faithfully

executed." U.S. Const. art. II, § 3.  Basic governance statutes authorize and require the Executive

to collect taxes only at congressionally mandated levels; to spend all congressionally

appropriated funds unless excused via the Impoundment Control Act of 1974; and to borrow by

issuing public debt to pay for obligations, including future debt service payments, when

incoming funds are not sufficient by congressional taxation levels. *See* 31 U.S.C. § 3104(a)

("The Secretary of the Treasury may borrow on the credit of the United States Government

amounts necessary for expenditures authorized by law.")  In regular order, Defendants refinance

old Treasury debt when total expenditures, including required debt service, exceed total revenue. The debt ceiling statute prevents the Executive from carrying out these conflicting statutory duties and has no rational basis.  *See* Henry J. Aaron, *Ignore the Debt Ceiling*, N.Y. TIMES, Sept. 29, 2013 at A25.  Professors Neil Buchanan and Michael Dorf persuasively describe how the debt ceiling's operational situation traps the Executive in an unconstitutional "trilemna."  The debt ceiling statute makes the President choose which of his three statutory duties he must violate – spending, taxing, or borrowing.  *See* Neil H. Buchanan & Michael C. Dorf, *How to Choose the Least Unconstitutional Option: Lessons for the President (and Others) from the Debt Ceiling Standoff*, 112 COLUM. L. REV. 1175 (2012); Neil H. Buchanan & Michael C. Dorf, *Nullifying the Debt Ceiling Threat Once and for All: Why the President Should Embrace the Least Unconstitutional Option*, 112 COLUM. L. REV. SIDEBAR 237 (2012): Neil H. Buchanan & Michael C. Dorf, *Bargaining in the Shadow of the Debt Ceiling: When Negotiating over Spending and Tax Laws, Congress and the President Should Consider the Debt Ceiling A Dead Letter*, 113 COLUM. L. REV. SIDEBAR 32 (2013).  In a more recent academic work, Buchanan and Dorf expand their analysis to clearly detail how operational default is actually "a more dangerous, less effective, and more unconstitutional method of violating the debt ceiling."  Professors Buchanan and Dorf explain:

> A presidential decision to default on the government's obligations would necessarily violate the Constitution in one of two ways (in addition to usurping Congress's spending power).  Either that default would increase the debt, violating Article I Section 8, or that debt would have to be immediately repudiated, violating Section 4 of the Fourteenth Amendment.

Buchanan, Neil H. and Dorf, Michael C., *Borrowing By Any Other Name: Why Presidential 'Spending Cuts' Would Still Exceed the Debt Ceiling* (January 28, 2014). Cornell Legal Studies Research Paper No. 14-04.  Available at SSRN:

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2386758.  The debt ceiling statute thus arbitrarily prevents the Executive Branch from fulfilling its obligations to the Plaintiff.

43.     On its face, the debt ceiling statute is contrary to the Fourteenth Amendment's Public Debt Clause; and by its operation, the debt ceiling arbitrarily violates Plaintiff's Fifth Amendment's Due Process rights.  The debt ceiling statute is thus repugnant to the Constitution. *See* Jacob D. Charles, *The Debt Limit and the Constitution: How the Fourteenth Amendment Forbids Fiscal Obstructionism*, 62 DUKE L.J. 1227 (2013).  Again, *Marbury v. Madison* is both analogous and instructive in its holding that "a law repugnant to the Constitution is void; and that *courts*, as well as other departments, are bound by that instrument." 5 U.S. 137, 180 (1803).  As with *Marbury* and *Perry*, this complaint's foundation rests on the limited powers of Congress. Chief Justice John Marshal wrote:

> The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.  To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?  The distinction between a government with limited and unlimited powers is abolished if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.  It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.

*Id.* at 176-77.  Similarly, this Court must choose: "Between these alternatives there is no middle ground.  The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it." *Id.*

## APA RIGHT OF REVIEW/WAIVER OF SOVEREIGN IMMUNITY

44.     "It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority." *Clark v. Library of Congress*, 750 F.2d 89 (DC

Cir. 1984) citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S 682 (1949).  In

companion with the Administrative Procedure Act ("APA") (which, as discussed below, contains

an explicit statutory waiver for this action), sovereign immunity is waived and review is proper

in the instant suit as against individual Defendant Lew.  Plaintiff ultimately seeks such specific

relief sufficient to prevent individual Defendant Lew from invoking or enforcing the

unconstitutional debt ceiling statute.

45.      The rationale for the *Larson* constitutional exception to sovereign immunity is

directly applicable here as "the conduct against which specific relief is sought is beyond the

officer's powers and is, therefore, not the conduct of the sovereign." *Larson*, 337 U.S. at 690.

Nothing less than the constitutional order commands this Court's review: "Under our

constitutional system, certain rights are protected against governmental action and, if such rights

are infringed by the actions of officers of the Government, it is proper that the courts have the

power to grant relief against those actions." *Id*. at 704.  The debt ceiling limitation may have

been conferred in proper "form" to Defendant Lew for his enforcement but the legislation's grant

of authority "is lacking in substance because of constitutional invalidity." CIVIL ACTIONS

AGAINST THE UNITED STATES, ITS AGENCIES, OFFICERS AND EMPLOYEES, § 1:3 (Jon. L. Craig,

Ed.)(West, 2003).

46.      Judicial review of this nonmonetary action, against *both* the Treasury Department

and its named Secretary Jacob Lew, is proper pursuant to the APA, which includes a right of

review with an explicit waiver of sovereign immunity. 5 U.S.C. § 701 - 706.  The APA applies as

Plaintiff seeks specific relief other than money damages, there is no other adequate remedy

available in another court, and the requested relief is not expressly or impliedly forbidden by

another. *See Chamber of Commerce v. Reich*, 74 F.3d 1322 (DC Cir. 1996).

47.     Plaintiff seeks only prospective, specific relief; this claim is based on the

Plaintiff's constitutional rights and Defendants' constitutional obligations in the context of the

unique "ongoing relationship between the parties." *Bowen v. Massachusetts,* 487 U.S. 879, 905

(1988).  Just as in *Bowen*, where a federal agency's prospective renunciation of advance

payments for a state Medicaid program was not about "money damages," Plaintiff's suit seeks

specific relief for the prospective enforcement of an obligation:

> The State's suit to enforce the Medicaid Act, which provides that the Secretary
> "shall pay" certain amounts for appropriate Medicaid services, is not a suit seeking
> money in *compensation* for the damage sustained by the failure of the Federal
> Government to pay as mandated; rather, it is a suit seeking to enforce the statutory
> mandate itself, which happens to be one for the payment of money.

*Id.* at 900.  Plaintiff's suit is not about money, but rather, about the constitutional guarantee that

his security holding will not be subject to questioning by the nation's government.

48.     As the Supreme Court subsequently explained in *Dept. of Army v. Blue Fox,*

*Inc.*, when analyzing APA review of an Army's subcontractor's lien claim:

> *Bowen* recognized, the crucial question under § 702 is … what Congress meant by 'other
> than money damages' (the precise terms of § 702).  *Bowen* held that Congress employed
> this language to distinguish between specific relief and compensatory, or substitute, relief.

525 U.S. 255, 261 (1999)(citing *Bowen*, 487 U.S. at 895)*.*  Plaintiff's instant claim seeks only

specific relief.  And, in *Great-West Life & Annuity Ins. Co. v. Knudson*, the Supreme Court

reaffirmed its *Blue Fox* "specific" versus "compensation" relief analysis and further emphasized

that *Bowen* involved an obligation to make prospective payments:

> Massachusetts claimed not only that the Federal Government failed to reimburse it
> for past expenses pursuant to a statutory obligation, but that the method the Federal
> Government used to calculate reimbursements would lead to underpayments in the
> future. Thus, the suit was not merely for past due sums, but for an injunction to
> correct the method of calculating payments going forward.

534 U.S. 204, 214 (202) (citing *Bowen*, 487 U.S. at 899).  The instant claim seeks only

prospective equitable relief to prevent Defendants' invocation and enforcement of the invalid law

"going forward." *Id.*

      49.     As the Federal Circuit recently explained, "*Bowen* also turned on the

'complexity of the continuous relationship between the federal and state governments

administering the Medicaid program.'" *Suburban Mortg. Assocs. v. U.S. Dep't of Hous. & Urban

Dev.*, 480 F.3d 1116, 1127 (Fed. Cir. 2007)(citations omitted).  The Federal Circuit emphasized

that the *Bowen* ruling was linked to complicated circumstances "that are not present in most

cases." *Id.*  This claim is just such a *Bowen*-like complicated circumstances case.  The instant

claim is presented in a broader circumstance involving many "sovereigns" who are direct holders

of the federal sovereign's Treasury debt.  These varied local, state and foreign sovereigns, who

along with the Plaintiff hold Treasury bills, notes and bonds, are threatened by the same debt

ceiling default.  These sovereigns will be vying with Plaintiff, and each other, for timely payment

and servicing of their Treasury holdings.  Complicating the circumstances further, other federal

agencies and entities also hold Treasury securities (e.g., Social Security Trust Fund, U.S. Military

Retirement Fund, Federal Reserve).  Attendant foreign policy complications are obvious as

foreign sovereigns and foreign nationals hold a large percentage of our nation's Treasury debt.

Just as holders of Argentine bonds have sued in U.S. federal courts to enforce their rights, foreign

holders of U.S. Treasury bonds may seek relief in foreign judicial forums if the debt ceiling is

enforced.  With Defendants' acknowledged inability and lack of authority to prioritize types or

amounts of Treasury debt servicing and redemption, Plaintiff's very modest debt holdings remain

mixed with the over five trillion dollar debt holdings of the many foreign sovereigns and foreign

nationals.  As of December, 2013, the total of such foreign holdings approximated

$5,794,900,000,000. *See Treasury Report*: *Major Foreign Holders of Treasury Securities*, available at *http://www.treasury.gov/resource-center/data-chart-center/tic/Documents/mfh.txt*.

50.     Plaintiff's instant claim against enforcement of the debt ceiling has contextual circumstances that involve the federal government's threatening to default on all obligations without the ability to prioritize payments between those amounts owed to bondholders and state entitlement program administrators.  Just as the Federal Circuit described:

> *Bowen* was a dispute between two sovereigns - a state government and the federal government - implicating federalism issues; the dispute centered on the administration of a major federal grant, the Medicaid program, involving enormous sums of money and complex interactions between the governments and the beneficiaries.

*Suburban Mortg. Assocs,* 480 F.3d  at 1127.  Indeed, the very program at issue in *Bowen* -- Medicaid advance payments -- is but one of scores of such state reimbursement entitlement obligations placed in nonpayment jeopardy by a default threatened by debt ceiling statute enforcement.  As the Federal Circuit said of *Bowen,* "the governments [are] locked into a fabric of long-term administration of the program." *Id.*  Defendants have acknowledged the inability and lack of authority to prioritize payments in the event of a default.  Plaintiff therefore has a due process interest in whether and how the Defendants will meet concurrent obligations such as payment of his debt and that of various state sovereign entitlement programs.  In threat of default, these state sovereigns will be vying with Plaintiff (and each other) for timely payment of federal obligations.  Plaintiff's concrete and certainly impending harm is inexorably linked to harm that will be suffered by every one of the fifty-plus states and territorial sovereigns – "involving enormous sums of money and complex interactions between the governments and the beneficiaries." *Id.*

51.     In analyzing the unusual circumstances that made *Bowen* appropriate for APA review, the Federal Circuit noted that the small program at issue (advance reimbursements for a

discrete Medicaid program to teach teaching basic living skills to the severely mentally disabled in Massachusetts) was part of the larger program "involving enormous sums of money and complex interactions between the governments." *Suburban Mort.*, 480 F.3d at 1127.  The Federal Circuit noted that "the money involved in the uncovered education services was a small fraction of the total reimbursement the state received each year for its Medicaid costs under the program." *Id*.  Similarly, here, Plaintiff's very modest Treasury holding has to be analyzed as a part of the whole of the Treasury obligations – each equally subject to debt-ceiling default.

52.     As the Federal Circuit explained, *Bowen* involved an "ongoing relationship between plaintiff and the Government" which required APA review to provide equitable relief regarding "the Government's *future* obligations under the program." *Id.*  The instant suit similarly requires APA review so as to provide this Court with equitable power for the relief necessary for resolution of the merits of the claim – to prospective relief that will insure the "Government's *future* obligations" to pay Plaintiff's longer term maturing securities holdings well into the future. *Id.*  Thus, APA review is proper and required for this claim seeking a Declaratory Judgment to void the debt ceiling, and prospective specific relief.

## TUCKER ACT DOES NOT SUPPLANT
## THIS COURT'S APA REVIEW AUTHORITY

53.     As this case might mistakenly appear -- on the surface -- to be contractual in nature and/or concerning money, Plaintiff has been given notice of the APA/Tucker Act "jurisdictional wire" that he may be required to walk. *Cobell v. Kempthorne*, 569 F. Supp. 2d 223, 247 (D.DC 2008).  This Court's *Kempthorne* ruling, referencing and quoting both *Bowen* and *Blue Fox,* provides a needed balance pole for attempting this walk:

> The Supreme Court has already made clear that, where money is at stake, it must be "the very thing to which [the plaintiff] was entitled" to come within the [702] waiver, or the suit must be brought "to enforce the statutory mandate itself, which happens to be one for the payment of money.

*Id.* at 246-47 (internal citations omitted).  Before the Plaintiff steps off onto the wire, Judge

James Robinson, in *Kempthorne*, provided a quick test to determine whether a claim's right of

review lay under the APA or the Tucker Act:

> A helpful mnemonic for the rule of *Bowen* is to consider whether payment of
> money was to remedy a wrong, or whether non-payment *was* the wrong.  It is the
> latter case - of continuing nonpayment in violation of the law - that can properly be
> reviewed under the APA's waiver of immunity.

*Id*. at 247.  In the instant case, Plaintiff argues that the "wrong" of the unconstitutional debt

ceiling -- which questions the "validity" of the Plaintiff's debt holding, requires Defendants'

threat of non-payment of Plaintiff's securities, and will cause Defendants' ultimate default on

those debts and all other public debt  --  falls squarely under APA review.

      54.      Plaintiff is ready to walk the "jurisdictional wire" to demonstrate that this is not

a Tucker Act case.  Plaintiff thus offers the following summary analysis in the event that this

Court is asked, or chooses, to conduct an inquiry as to whether the Tucker Act/Little Tucker Act

applies.

      55.      Plaintiff attests that his present total Treasury holdings total $2300.  Plaintiff's

treasury holdings have always totaled below, and will always remain below, the "Little Tucker

Act" $10,000 threshold. 28 U.S.C. § 1346 (a)(2).  Further, Plaintiff hereby waives any claim for

any type of interest in any amount over $9,999; this Court, therefore, would continue to have

jurisdiction (concurrent with the Court of Federal Claims) even if the claim were to be analyzed

under Tucker Act authority. *See VanderMolen v. Stetson*, 571 F.2d 617 (DC Cir. 1977).  In no

instance would removal to the Court of Federal Claims be proper, and Plaintiff preemptively

opposes such removal. *See Richardson v. Morris,* 409 U.S. 464, 466 (1974).

      56.      As repeatedly noted above, Plaintiff's claim against the government seeks only

specific relief to prevent Plaintiff's concrete and certainly impending harm.  The claim is not a

disguised contract claim, nor is the claim based essentially on a contract.  There is no contractual aspect to the "source" of the cause of action, nor to the "type" of requested remedy. *See Holly Sugar Corp. v. Veneman,* 355 F.Supp.2d 181 (D.D.C., 2005).  The source of Plaintiff's claim is the Constitution and the type of relief sought is specific. *See Ingersoll-Rand Co. v. United States,* 780 F.2d 74 (DC Cir. 1985), *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (DC Cir. 1982), and *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 4 (DC Cir. 1998).

57.     Just as the Federal Circuit ruled in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1995): "The answer to the sovereign immunity and jurisdiction questions depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution." *Id.* at 1209 (quoting, *Transohio Sav. Bank v. Director, OTS,* 967 F.2d 598, 609 (D.C.Cir.1992)).

58.     Plaintiff acknowledges, however, that the Federal Circuit, in exercise of its exclusive appellate jurisdictional charge for Tucker Act cases, has more recently refined and restricted application of the Supreme Court's *Bowen v. Massachusetts* ruling in various types of claims against the government. *See, e.g., Suburban Mortg. Assocs. v. U.S. Dep't of Hous. & Urban  Dev.*, 480 F.3d 1116 (Fed. Cir. 2007).

59.     In cases which even allude to a contract or a money claim against the government, the Federal Circuit dutifully searches to make certain that the claim is not at bottom a "suit for money." *Id.* at 1118.  And, the Federal Circuit is helpfully transparent in its analytical processes: "If the suit is at base a claim for money, and the relief available…under the Tucker Act - a money judgment - will provide an adequate remedy, the inquiry is at an end.  There is no need to address the § 702 "money damages" limitation because § 704 precludes adjudication under the APA." *Id.* at 1125.

60.     The Federal Circuit gives strong and clear warning to litigants not to attempt to circumvent Tucker Act jurisdiction by their pleadings.  The Federal Circuit attempts to draw a brighter line in applying *Bowen. See, e.g.*, *Consol. Edison Co. of N.Y. v. United States Dep't of Energy*, 247 F.3d 1378 (Fed. Cir. 2001), and *Christopher Vill., L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004).

61.     The Federal Circuit offers caution for counsel, District Judges, and even its regional sister Circuit Judges:

> [T]he regional circuits are of course free to provide such guidance as they choose to the district courts in their circuits, and when the question of jurisdiction comes up outside of these interlocutory appeals, the district courts properly may look to the law of their circuit for guidance.  But guidance from and reliance upon regional circuit law must take into account two considerations.  First, since 1988 and the *Bowen* decision, there has been considerable development regarding this jurisdictional issue.  The regional circuit court cases may be older cases, and indeed, as was the case here, some may have been decided before *Bowen.* Second, and of equal if not greater importance, for almost twenty years this court has been tasked by Congress to be the exclusive arbiter of the issue when it is brought to us in these interlocutory appeals.  We of course are bound to follow our own circuit law.  District courts, as well as counsel for the parties, would be better able to predict the outcome of such appeals if they follow the same law.

*Suburban Mortg. Assocs.,* 480 F.3d  at 1128.

62.     The Federal Circuit is even more direct in stating to the "cottage industry among lawyers" that it is sensitive to forum shopping designed to avoid its Tucker Act authority:

> One consequence of the *Bowen* case has been to create a sort of cottage industry among lawyers attempting to craft suits, ultimately seeking money from the Government, as suits for declaratory or injunctive relief without mentioning the money.  If successful, a plaintiff could have the case heard under the APA in one or another district court, with appeal to a regional circuit, rather than in the Court of Federal Claims, where money claims against the Government are routinely heard and decided, with appeal in the Federal Circuit.

*Id.* at 1124. The Federal Circuit warns that it will "thwart" such attempts by looking "beyond the form of the pleadings to the substance of the claim.  We have cautioned litigants that dressing up

a claim for money as one for equitable relief will not remove the claim from Tucker Act

jurisdiction and make it an APA case." *Id.*

63.     Plaintiff in the instant case thus respectfully and most strongly avers that he is

not associated with the "cottage industry" mentioned above, and that his claim is neither based-

on-contract nor is a claim for money.  Plaintiff seeks only prospective equitable relief, which is

not available under Tucker Act authority. *See King v. United* States, 395 U.S. 1 (1969); *Best v.*

*United States*, 14 Cl. Ct. 720 (1988).  Plaintiff does not seek "money in *compensation*" but rather

seeks only to enforce the constitutional mandate to void the statute. *See Bowen,* 487 U.S. at 900.

64.     Plaintiff argues that the Federal Circuit's efforts to restrict *Bowen*'s application

help to prove why the instant claim should not fall under Tucker Act authority.  As argued above,

Plaintiff's instant claim is very similar, in complex factual circumstance and prospective

requested relief, to the claim in *Bowen*, and is quite dissimilar to the facts of the Federal Circuit's

more recent line of Tucker Act determinations.

65.     Just as in *Bowen*, Plaintiff asserts that it is "appropriate for judicial review to

culminate in the entry of declaratory [and] injunctive/mandamus relief that requires the

[Treasury] Secretary to modify future practices." *Bowen*, 487 U.S. at 905.  Just as in *Bowen*, a

"naked money judgment against the United States" is not requested and would simply not be an

"adequate substitute for prospective relief fashioned in the light of the rather complex ongoing

relationship between the parties." *Id.*

66.     Plaintiff further acknowledges that various academic commentaries on the

*Bowen* ruling have provided strong support for the Federal Circuit's efforts to cabin the ruling's

application. *See, e.g.*, Michael F. Noone, Jr. & Urban A. Lester, *Defining Tucker Act Jurisdiction*

*After Bowen v. Massachusetts*, 40 CATH. U. L. REV. 571, 603 (1991) and Gregory C. Sisk, *The*

*Tapestry Unravels: Statutory Waivers of Sovereign Immunity and Money Claims Against the*

*United States*, 71 GEO. WASH. L. REV. 602, 605-06 (2003).  By emphasizing the unusual circumstances of *Bowen*, these academic works also help show why Plaintiff's instant claim -- set among the most unusual circumstances and presenting itself as many times more complicated than *Bowen* -- should not be reviewed under Tucker Act authority.

67.     A separate prudential consideration must be raised in considering whether the Tucker Act divests this Court of APA review authority over such claims that might result from the default of public debt obligations.  After a debt ceiling-caused default leaves the Treasury bankrupt, the Judgment Fund, 31 U.S.C. § 1304, like all other Treasury accounts, will be empty. Any Tucker Act money judgment – entered subsequent to a default -- would necessarily be queued-up as just more bad debt behind the Treasury's preexisting unpaid debts and obligations.

68.     In *Suburban Mortgage*, the Federal Circuit stated that plaintiff's "concerns about possible bankruptcy" were not "a basis for saying that there is not an adequate remedy in the Court of Federal Claims." *Suburban Mortg. Assocs.,* 480 F.3d  at 1127.  The "bankruptcy" of the Treasury resulting from a debt ceiling default, however, is this Court's concern as it would render any resulting Tucker Act money judgment a practical absurdity.

69.     As discussed above, it is well established that Tucker Act authority does not confer equitable authority.  Neither the Court of Federal Claims, nor this Court acting as a substitute claims court, could order the Treasury to prioritize payment of a resulting money judgment as superior to other past-due Treasury debt obligations. *See King v. United States*, 395 U.S. 1 (1969) and *Best v. United States*, 14 Cl. Ct. 720 (1988).  Neither could the Court of Federal Claims or this Court, under Little Tucker Act authority, order the raising of taxes for a money judgment's timely satisfaction; such extraordinary authority is reserved for Article III courts exercising Article III authority. *See Missouri v. Jenkins*, 495 U.S. 33 (1990).

70.     For all the foregoing reasons, Plaintiff argues that the Tucker Act does not apply to this cause and that this Court should not be divested of its Article III review authority.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff Victor Williams most respectfully requests a declaratory judgment that the debt ceiling statute is unconstitutional and void.

Plaintiff also requests a permanent injunction to prohibit the Defendants from relying upon, invoking, or enforcing the invalid debt ceiling law.  Alternatively, if the Court determines injunctive relief an insufficient remedy, Plaintiff asks for a writ of mandamus to compel the Defendants to treat the debt ceiling statute as null and void as they carry out their solemn duties to timely service the public debts and all other obligations of the United States of America.

Plaintiff further requests that this Court retain jurisdiction of this action until Defendants have complied with any and all orders issued by the Court, and that this Court order such other and further relief, including Plaintiff's costs, that it may deem necessary and proper.

 Respectfully submitted,

/s/ Victor Williams
_____

Victor Williams                                    DATED:  March 5, 2014
DC Bar No. 428505                            WASHINGTON, DC
*(for himself)*

Faculty Suite 480A
Columbus School of Law                     Residence:
Catholic University of America
Washington, DC 20064                         5209 Baltimore Ave
202-319-5559                                        Bethesda, MD 20816
williamv@law.edu