# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| **VICTOR K. WILLIAMS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **JACOB J. LEW, in his official** | ) | |
| **capacity as Secretary of the** | ) | |
| **U.S. Department of the Treasury,** | ) | **Case No. 1:14-cv-00183-RJL** |
| **and** | ) | |
| **U.S. DEPARTMENT OF THE TREASURY** | ) | |
| **Defendants.** | ) | |

_____

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANTS' MOTION TO DISMISS

Defendants' motion to dismiss should be denied as Plaintiff's claims – averring past, present, ongoing, and certainly-impending harms -- are ripe for review. Plaintiff holds his nation's debt under a constitutional guarantee *not only* that the Treasury debt instruments will remain valid, *but also* that the "validity" of those securities will never be "questioned" by his nation's government. Section Four of the Fourteenth Amendment ("Public Debt Clause") guarantees to the Plaintiff that the validity, integrity, and security of his public debt holdings will never be exposed to any legal uncertainty. This provision was one several fundamental guarantees contained in the three transformative Civil War Amendments to the Constitution. U.S. CONST. AMEND. XIII, AMEND XIV, and AMEND XV. The Public Debt Clause's prohibition joins proscriptions against slavery, against unequal protection of the law, and against racial voting barriers. Legislative acts that *facially* contravene such fundamental constitutional guarantees are subject to the judiciary's invalidation on facial examination. *See Brown v. Board of Education* (I), 347 U.S. 483 (1954); *see also*, *Bolling v. Sharpe,* 347 U.S. 497 (1954).

The judiciary's use of equitable authority to prevent such invalid legislation from being enforced should not be delayed, but rather done with "all deliberate speed." *Brown v. Board of Education* (II), 349 U.S. 294, 301 (1955). [1]

**Preface: Facial Violations of the Fourteenth Amendment; Illegally Segregated Public Schools and Illegally Limited Public Debt.**

In *Brown v. Board of Education* (I), the Supreme Court acknowledged and struck down "separate-but-equal" legislation's *facial* violation of the Fourteenth Amendment. [2] Chief Justice Earl Warren wrote for the unanimous Court:

> Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment.

*Id.* at 492. Plaintiff's first amended complaint similarly asserts a *facial* violation of the United States Constitution. The debt limit statute, 31 U.S.C. §3101, facially and inherently contravenes a fundamental provision of the very same Fourteenth Amendment -- Section Four's Public Debt

---

[1] Analogies to the *Brown v. Board* adjudications apply to the similarities in constitutional analysis. Plaintiff makes no personal comparison between himself and the exceptionally brave plaintiffs who litigated *Brown* and related desegregation cases, nor to their courageous counsel.

[2] *See generally*, Richard Fallon, *Fact and Fiction About Facial Challenges*, 99 Cal. L. Rev. 915 (2011)( "Consider, for example, the test applied to invalidate an affirmative action program in *City of Richmond v. J.A. Croson Co.* By the Court's own analysis, the City of Richmond could have awarded preferences to identified victims of past racial discrimination. Yet the Court's test assessed the constitutionality of the program on its face, not as-applied, and produced the conclusion that the program was invalid. Similar determinations of facial invalidity have occurred, frequently without comment, in cases from *Brown v. Board of Education* under the Equal Protection Clause, to *Brandenburg v. Ohio* under the First Amendment, to *United States v. Lopez* under the Commerce Clause.") *Id.* at 918 (citations omitted).

Clause. U.S. CONST. AMEND. XIV, § 4.  Plaintiff's actual and concrete harm is thus obviously past, present and ongoing.

The *Brown* plaintiffs' protected interest was *facially* violated by state statutes that separated -- and thus made unequal -- that which the Fourteenth Amendment's Section One explicitly says may never be unequal.  Similarly, the instant Plaintiff's protected interest is *facially* violated by a congressional statute that limits -- and thus questions the public debt's validity-- that which the Fourteenth Amendment's Section Four explicitly says may never be questioned.

 As there can be no separated-but-equal education regime under the Fourteenth Amendment's Equal Protection Clause; there can be no limited-but-valid public debt regime under the Fourteenth Amendment's Public Debt Clause.  Again, the *facial* violation causes Plaintiff's actual and concrete harm -- past, present and ongoing.

The Supreme Court in *Brown* did not need to address the purported legislative purposes and complex political justifications for the longstanding "separate-but-equal" legislation:  The national importance of honoring equal educational access for the plaintiffs (and all similarly situated individuals) served as sufficient justification for *Brown*.  Similarly, this Court need not address the purported legislative purposes and political justifications for the longstanding debt limit statute:  The national importance of honoring the validity of  public debt held by Plaintiff (and all other similarly situated individuals, institutions, and sovereigns) is sufficient justification to void the statute.  Plaintiff asserts an *absolute expectation of security* in his Treasury debt[3], and

---

[3] In contrast, for example, with the Fourth Amendment's "*reasonable expectation of privacy*" protection, the Public Debt Clause's guarantee is not subject to any reasonableness inquiry, or government interest balancing, or "special needs" exceptions.  The Public Debt Clause's guarantee of the validity and integrity of Plaintiff's public debt holdings is by its textual reference beyond question – it creates an "*absolute expectation of security.*"

Plaintiff submits that the *facial* violation strips him of his Treasury investments' unique constitutionally-guaranteed worth.

Just as the *Brown* Court did not require the plaintiffs to prove as-applied harm resulting from the state statutes' *facial* violation of the Fourteenth Amendment Equal Protection Clause, neither should this Court require Plaintiff to prove as-applied harm from the legislation's facial violation of its Public Debt Clause.

Nevertheless, the Plaintiff will fully describe below his as-applied harms. These separately averred harms are each caused by the debt limit statute's conflict with the Public Debt Clause. Plaintiff will respond specifically to Defendants' allegation that the averred harms are only the product of his "anticipatory speculation." This strange allegation is made throughout the Defendants' dismissal memorandum ("Def.M."). Plaintiff does not conjure-up these concerns for academic debate. Rather, it is Defendant Jacob J. Lew, Secretary of the Treasury, who repeatedly warns of the dangers of debt ceiling statute brinkmanship. And Defendant Treasury Department continues to repeat those warning while emphasizing that the enforcement of the debt ceiling will inevitably cause a "catastrophic" government default.[4]

Just as the *Brown* (II) Court ignored injudicious calls from highly placed officials for a "prudential" delay of implementation of the desegregation judgment to a better day (month, year, decade), this Court should reject Defendants' misapplied ripeness and prudential delay

---

[4] See e.g., *The Debt Limit, Hearings Before the Senate Committee on Finance*, 113th Cong. (2013) (testimony of The Honorable Jacob J. Lew, Secretary, United States Department of the Treasury), *available at*   http://www.finance.senate.gov/hearings/hearing/?id=cb3ca699-5056-a032-52fb-9f23396c3f7c; and Treasury Report:  The Potential Macroeconomic Effect of Debt Ceiling Brinksmanship, Oct. 3, 2013, *available at* http://www.treasury.gov/initiatives/Documents/POTENTIAL%20MACROECONOMIC%20IMPACT%20OF%20DEBT%20CEILING%20BRINKMANSHIP.pdf.

arguments.  Indeed, this District Court is justified to move with all the "deliberate speed" as is needed to provide Plaintiff with timely declaratory and injunctive relief --  thus also preventing a government debt default with "catastrophic" harm to our nation's economy and to her most economically vulnerable people.  *See Brown v. Board of Education* (II), 349 U.S. 294, 301 (1955).

**Introduction:  Defendants Warn of Both Actual and Certainly-Impending Harm.**

In addition to providing this response opposing the Defendants' dismissal motion, the Plaintiff is today filing a motion for leave of this Court to amend his first amended complaint together with the original of a second amended complaint in order to facilitate Defendants' better understanding of his claims, further develop his basis for standing and ripeness, and add analysis of a May 7, 2014 congressional communication from Defendant.  Plaintiff gladly bears his burden of demonstrating that jurisdiction exists for this action. *Khadr v. United States,* 529 F.3d 1112, 1115 (D.C. Cir. 2008).  As a citizen-bondholder[5], Plaintiff thus welcomes the Court's 12(b)(1) inquiry prompted by the Defendants' motion to dismiss and memorandum.

The dismissal memorandum exposes Defendants' fundamental misconstruction of the Plaintiff's claims.  It also evidences a cramped reading of his averred harms.  The Defendants' memorandum specifically states: "He does not allege any actual or present harm from the federal debt limit statute;" and "Plaintiff does not allege any current injury; he claims standing on the basis of anticipated future harm only." Def.M.7.

As the debt ceiling statute, 31 U.S.C. §3101, *facially* contravenes the Public Debt Clause's absolute constitutional guarantee, Plaintiff does indeed aver *actual and present* harm.

---

[5] Plaintiff also notes his taxpayer status in his first amended complaint. This is because the Treasury holdings' tax advantage comprise part of the financial reason for his investment. Contrary to the Defendants' memorandum, Plaintiff is not averring disfavored taxpayer standing.

Plaintiff's *absolute expectation of security* in his Treasury holdings is *facially* violated, and Plaintiff is thus *presently* stripped of his investments' unique constitutionally-guaranteed worth. Plaintiff suffers actual harm (past, present, ongoing) from the *facial* violation.  Plaintiff avers additional as-applied *present* harm as Defendants repeatedly threaten to arbitrarily enforce the unconstitutional statute while acknowledging that they have no reliable method to protect Treasury bondholders.  Plaintiff suffers actual harm (past, present and ongoing) from these repeated threats of arbitrary statutory enforcement without due process. U.S. CONST. AMEND. V.

As Plaintiff's first amended complaint explains, the textual analysis, drafting history, and functional purpose of the Public Debt Clause prove that its scope is broad and its proscription is absolute.  The *facial* violation, and thus the harm suffered, is patently *present* harm.  Plaintiff's first amended complaint explains that the prohibited government action need not rise to a formal "repudiation" of the legal obligation to repay a debt, nor to an actual "default" based on a refusal to pay, nor even to an anticipatory default based on an inability to timely pay back.  Rather, the Constitution sets an even higher assurance for holders of its debt obligations – public debt protection is triggered by the government's mere questioning or impugning its debt obligations. The congressional authors of the Fourteenth Amendment's Public Debt Clause were resolute in intending "to lay down a constitutional canon for all time in order to protect and maintain the national honor and to strengthen the national credit." Phanor J. Eder, *A Forgotten Section of the Fourteenth Amendment*, 19 CORNELL L.Q. 1, 15 (1933).  The full text of Section 4 is instructive in its broad reference of an assurance for debt:

> The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned.  But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

6

U.S. CONST. AMEND. XIV, § 4.  Professor Jack Balkin connects the Fourteenth Amendment's

drafting history and text to its contemporary relevance: "Section 4 targets the worry that, once

fully readmitted to the Union, senators and representatives from Southern states ... would

deliberately refuse to repay debts incurred in suppressing the confederate rebellion."  Professor

Balkin further explains:

> [T]he language of the Amendment went beyond this particular historical
> concern.  It was stated in broad terms in order to prevent future majorities in
> Congress from repudiating the federal debt to gain political advantage, to seek
> political revenge, or to try to disavow previous financial obligations because of
> changed policy priorities.

Jack Balkin, *The Legislative History of Section Four of the Fourteenth Amendment,*

BALKINIZATION.COM, June 30, 2011, *available at* http://balkin.blogspot.com/2011/06/legislative-

history-of-section-four-of.html.

        As noted above, the contemporary authority of Section Four is best understood by its

full, weighty post-bellum context.  It joins other broadly-stated, absolutist provisions of the

Thirteenth, Fourteenth and Fifteenth Amendments in their sweeping language abolishing slavery,

ensuring equal protection of the laws, and charging national protection of the right to vote.

These are absolutist proscriptions.  As with the other provisions, the Public Debt Clause

fundamentally alters the 1787 Charter's political and economic order. *See* BRUCE A. ACKERMAN,

WE THE PEOPLE:  TRANSFORMATIONS 230-34 (1998).  At a minimum, Section Four of the

Fourteenth Amendment further restricts the national legislature's already limited authority.  As

Chief Justice John Marshall reminded in 1803: "The powers of the legislature are defined and

limited; and that those limits may not be mistaken, or forgotten, the constitution is written."

*Marbury v. Madison*, 5 U.S. 137, 176 (1803).

Lastly, Plaintiff avers additional as-applied future harm from his personal risk of a government default that will result from the statute's enforcement -- Plaintiff suffers a real risk of certainly-impending harm when the statute is enforced.

All the averred harms (past, present, ongoing, and certainly-impending future) result from the debt ceiling statute invasion of Plaintiff's constitutionally protected interest. The harms are concrete and particularized to the Plaintiff as a holder of various types of Treasury debt and of retirement accounts holding such Treasury debt. The Plaintiff meets all standing requirements: His harms are both actual and imminent, they are causally connected to the constitutional violations, and they are not the result of the independent action of any third party. The injuries will be redressed by a favorable decision of this Court.

Most telling as to Defendants' misconstruction of Plaintiff's claims, however, is the fact that the Defendants' memorandum is firmly committed to the position that the debt limit statute is not a current concern, and that a debt-ceiling-caused default is nothing more than a "remote possibility" borne of the Plaintiff's "anticipatory speculation" about the future. Defendants' memorandum asserts that the "unprecedented government default Plaintiff claims to fear" is a mere "hypothetical premise." Def.M.7. The Defendants' memorandum asserts that "Plaintiff's standing allegations are altogether speculative." *Id.*

In making these assertions, the memorandum directly contradicts the Defendants' ongoing and repeatedly-stated position (from before 2011-present), that a "catastrophic" government default was imminent when the debt limit was enforced. The memorandum directly contradicts Defendants' repeatedly-taken emergency "extraordinary actions" required to avoid a full default when the debt ceiling was reached and its limit enforced. The memorandum contradicts the Defendants' repeated warnings to Congress -- and to the public -- regarding

dangers to bondholders inherent in partisan debt ceiling brinkmanship.  The memorandum's core argument contradicts Defendant Lew's explicit warnings to Treasury debt holders about the imminent nature of a debt default.  Defendants' memorandum makes no attempt to reconcile the conflict between the Defendants' ongoing warnings about the inherent threat of the debt limit and the Defendants' present litigation strategy against Plaintiff.

The conflict between these positions is especially stark as Defendants have long offered these warnings -- even before the dangerous 2013 and 2014 debt default near-misses.  Consider this excerpt from a January, 2011 letter to "Congress and the public" from former Treasury Secretary Tim Geithner:

> However, for the benefit of Members of Congress and the public, I want to make clear, for the record, what the implications of a default would be so there can be no misunderstanding when the issue is debated in the House and Senate.   ….

- The Treasury would be forced to default on legal obligations of the United States, causing catastrophic damage to the economy, potentially much more harmful than the effects of the financial crisis of 2008 and 2009.
- A default would impose a substantial tax on all Americans.  Because Treasuries represent the benchmark borrowing rate for all other sectors, default would raise all borrowing costs.  Interest rates for state and local government, corporate and consumer borrowing, including home mortgage interest, would all rise sharply.  Equity prices and home values would decline, reducing retirement savings and hurting the economic security of all Americans, leading to reductions in spending and investment, which would cause job losses and business failures on a significant scale.
- Default would have prolonged and far-reaching negative consequences on the safe-haven status of Treasuries and the dollar's dominant role in the international financial system, causing further increases in interest rates and reducing the willingness of investors here and around the world to invest in the United States.
- Payments on a broad range of benefits and other U.S. obligations would be discontinued, limited, or adversely affected, including:
  - U.S. military salaries and retirement benefits;
  - Social Security and Medicare benefits;
  - veterans' benefits;
  - federal civil service salaries and retirement benefits;
  - individual and corporate tax refunds;
  - unemployment benefits to states;
  - defense vendor payments;

- o   interest and principal payments on Treasury bonds and other securities;
- o   student loan payments;
- o   Medicaid payments to states; and
- o   payments necessary to keep government facilities open.

For these reasons, any default on the legal debt obligations of the United States is unthinkable and must be avoided.  It is critically important that Congress act before the debt limit is reached so that the full faith and credit of the United States is not called into question.  The confidence of citizens and investors here and around the world that the United States stands fully behind its legal obligations is a unique national asset.

Erika Gudmundson, *Secretary Geithner Sends Debt Limit Letter to Congress,* Jan. 6, 201*available at* http://www.treasury.gov/connect/blog/Pages/letter.aspx

Defendants now alledge, however, that the Plaintiff's concerns are based only on the Plaintiff's hypothetical and speculative fears.  Plaintiff respectfully submits that there is not a "remote possibility" of reconciling Defendants' dismissal memorandum and Defendants' past and ongoing public position that warns about debt-ceiling default dangers.  Indeed, Defendants' memorandum has now placed Treasury Secretary Jacob Lew with one foot in the camp of the most extreme of ideological "default-deniers." *See* Rachel Bade, *Default Deniers Scoff at Debt-Ceiling Apocalypse*, Politico, Jan. 16, 2013, http://www.politico.com/story/2013/01/default-deniers-pooh-pooh-debt-ceiling-apocalypse-86253.html.

The dismissal memorandum further asserts that Treasury debt instruments, such as those held by Plaintiff, have always been, and remain, a "safe and secure" investment option: "Treasury securities such as those held by Plaintiff 'are considered a safe and secure investment option because the full faith and credit of the U.S. government guarantees that interest and principal payments will be paid on time.'" Def.M.7.

Yet, Defendants have repeatedly warned, and continue to presently warn, that the mere prospect of partisan conflict regarding the statute threatens the "full faith and credit" of the

United States. *See e.g.*, Kasia Klimasinska & Ian Katz, *Lew Sees No Alternative to Congress Raising Debt Limit,* Bloomberg.com, Nov. 19, 2013, *available at http:// www.bloomberg.com/news/2013-11-19/lew-sees-no-alternative-to-congress-raising-debt-limit-by-feb-7.html*.  When the Fitch rating agency placed United States on "negative watch" for a sovereign debt downgrade in October 2013, it reported that the debt-ceiling conflicts -- repeating and worsening since 2011 -- cast serious "doubt over the full faith and credit of the U.S."

Defendants' memorandum correctly asserts that this Court "may consider materials outside the pleadings" in ruling on their 12(b)(1) motion. *Bank of Am., N.A. v. FDIC,* 908 F.Supp.2d 60, 76 (D.D.C. 2012).  Plaintiff thus respectfully encourages this Court to examine the resources of expert and policy commentary explaining why the debt ceiling causes present harm to bondholders, and why there is no doubt that Defendants' enforcement of the debt limit statute will cause a government default.  This Court is also respectfully encouraged to examine the Defendants' many public statements and congressional communications warning of intrinsic dangers and harms of the statute to debt holders and stating with certainty that a "catastrophic" government default will be caused by enforcement of the statute.  These statements and warning are ongoing because the threat of debt ceiling harm is ongoing; the Defendants' helpfully maintain a repository of such statements and communications on the Treasury Department's website. *See* Debt Limit, *available at* http://www.treasury.gov/initiatives/pages/debtlimit.aspx.

On February 3, 2014, four days before the November 2013 "Default Prevention Act" was set to expire, for example, Defendant Lew stated in a speech to the Bipartisan Policy Conference:

> Let me repeat: in just a matter of days, the temporary suspension of the debt limit will end, and the Treasury Department will have to start using extraordinary measures so the government can continue to meet  its obligations….[I]t is imperative that Congress move right away to increase our borrowing authority.  It would be a mistake to wait until the

11th hour to get this done.  As House Speaker John Boehner has said—not only should the United States never default on its debt, we "shouldn't even get close to it."  The fact is, simply delaying action on the debt limit can cause harm to our economy, rattle financial markets, and hurt taxpayers.  Just think about it, around the time of last year's stand-off, we saw consumer and business confidence drop.  And investors and market participants publicly questioned whether it was too risky to hold certain types of U.S. government debt.  Such a question should be unthinkable.  So the bottom-line is: Time is short.

Remarks of Secretary Jacob J. Lew at the Bipartisan Policy Center, Feb. 3, 2014, available at

http://www.treasury.gov/press-center/press-releases/Pages/jl2276.aspx.  Four days after

Defendant Lew's Bipartisan Policy Center remarks -- on February 7, 2014, just hours before the

debt ceiling suspension's expiration -- Plaintiff filed his initial complaint in this action.


I.      **History and Tradition of Fourteenth Amendment Public Debt Clause Litigation: Plaintiff's Solid Standing.**

"We begin with a statement of the most basic doctrinal principles: Article III, § 2, of the

Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and

'Controversies.'  That case-or-controversy requirement is satisfied only where a plaintiff has

standing." *Sprint Communications Co., L.P. v. APCC Services, Inc.* 554 U.S. 269, 274 (2010).

The Supreme Court has "often said that history and tradition offer a meaningful guide to the

types of cases that Article III empowers federal courts to consider." *Id.* at 274.

As Plaintiff's first amended complaint references, in 1935, the Supreme Court

adjudicated a case that asked whether Section Four of the Fourteenth Amendment explicitly

restricts Congress' authority when borrowing money on the credit of the United States. *Perry v.*

*United States*, 294 U.S. 330 (1935).[6]  The *Perry* plurality rejected applying procedural bars, such

---

[6] The historical/traditional importance of the *Perry* adjudication of the Public Debt Clause has long been analogized to that of *Marbury v. Madison*, 5 U.S. 137 (1803).  Recent scholarship has refreshed the comparison of *Perry* and *Marbury*, noting the foundational nature of each to

as sovereign immunity, that might have prevented judicial examination of congressional interference with a Treasury bondholder's expectations under the Public Debt Clause, stating: "Having this power to authorize the issue of definite obligations for the payment of money borrowed, the Congress has not been vested with authority to alter or destroy those obligations." *Id*. at 350-52.  Rather, the Court explored the "clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements when it has borrowed money under the authority which the Constitution confers." *Id.* at 351.

   *Perry* further established an expansive scope for this Court's exploration of the protections offered to the instant Plaintiff by the Public Debt Clause of the Fourteenth Amendment: "Nor can we perceive any reason for not considering the expression 'the validity of the public debt' as embracing whatever concerns the integrity of the public obligations." *Perry,* 294 U.S. 330, at 354.

   Plaintiff submits that *Perry* proves that the instant litigation fits squarely in the history and tradition of the types of cases that Article III empowers federal courts to consider; and Plaintiff asserts that his standing to challenge the unconstitutional debt ceiling statute is as solid as that historic foundation.  The Plaintiff's averred harms, which form the basis of his standing, result from the debt ceiling statute's invasion of Plaintiff's constitutionally protected interest.

---

constitutional adjudication. *See e.g.,* Gerard N. Magliocca, *The Gold Clause Cases and Constitutional Necessity*, 64 FLA. L. REV. 1243, 165-68 (2012)(quoting Arthur M. Schlesinger who described *Perry* as a "masterpiece of judicial legerdemain hardly matched in the annals of the Court since Marshall's opinion in *Marbury v. Madison.*").

The harms are concrete and particularized.  The harms are both actual and impending, they are

causally connected to the constitutional violations, and they are not the result of the independent

action of any third party.  The averred injuries will be redressed by a favorable decision of this

Court.

II.     **Plaintiff Suffers Actual (Past, Present, and Ongoing), Concrete, and Particularized Harm from the Debt Ceiling Statute's Facial Violation of Plaintiff's *Absolute Expectation of Security*; Statute Facially Strips Unique Worth of  Plaintiff's Treasury Holdings.**

The Public Debt Clause guarantees to the Plaintiff that the validity, integrity, and security

of his public debt holdings will never be questioned by his nation's government.  This

constitutional provision thus creates an *absolute expectation of security* for Plaintiff as a holder

of United States Treasury-issued debt.  The provision also imbues his Treasury-issued debt with

unique constitutionally-guaranteed worth – making U.S. Treasury securities an investment with a

special value unlike any other investment opportunity available anywhere in the world.

To establish standing, this Court has most recently restated that "an injury must be

concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and

redressable by a favorable ruling.'" *Klayman v. Obama*, 957 F. Supp. 2d 1, 14 (D.D.C. 2013)

(Leon, J.) (citation omitted).  Plaintiff has suffered, and continues to presently suffer, injury-in-

fact because the debt ceiling statute facially violates his *absolute expectation of security* in his

Treasury holdings and because the statute facially strips his holdings of their unique

constitutionally-guaranteed worth.

Because Treasury debt is constitutionally guaranteed to be secure beyond any

questioning, Plaintiff holds his nation's Treasury debt as an investment option -- despite his

knowledge that the saving bonds and marketable holdings pay a relative miniscule rate of interest

return and that his Certificate of Indebtedness account pays zero interest.  Plaintiff thus suffers substantial and concrete (past, present, and continuing) actual harm because the debt ceiling statute's strips his Treasury holdings of their unique constitutionally-guaranteed worth.  As averred in his Second Amended Complaint, which is will be submitted this day together with a leave motion to the Court, Plaintiff also has harm as his interest in a government TSP G fund would be frozen in the risk of a default resulting from enforcement of the debt ceiling.  It is known that Defendants use the TSP G Fund as an "extraordinary measure" account from which Defendants' borrow to avoid an actual default.  This practice turns Plaintiff's interest in the TSP account into additional government debt. *See* Fred Smith, *Borrowing from the G Fund (Again) to Offset the Debt Ceiling*, FedSmith.com, Feb. 5, 2014, available at

http://www.fedsmith.com/2014/02/05/borrowing-from-the-g-fund-again-to-offset-the-debt-ceiling/.  As also averred, Plaintiff suffers the same risk of illiquidity in the percentage of his TIAA-CREF retirement account held in Treasury Inflation Bond Fund.

   As argued above, the debt ceiling statute is facially injurious.[7]  The harm, as with the debt ceiling statute's constitutional violation, is patent; "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 687(J. Scalia, dissenting).  The facial harm and additional as-applied enforcement harm suffered by Plaintiff is particularized harm to the Plaintiff because he is a Treasury debt holder.  It is not, as described by Defendants memorandum, a matter of "generalized concern" because there are "countless individuals are similarly situated to Plaintiff." Def.M.10.  Just because there are many other Treasury bondholders who are also

---

[7] This facial harm is separate from the additional, as-applied harm that Plaintiff suffers from the Defendants' continued threatened enforcement of the debt-ceiling and from the risk of certainly impending injury resulting from a government default.  (This dual enforcement harm is discussed later.)

harmed by the debt ceiling's facial violation -- violating their *absolute expectation of security* in their Treasury bonds and stripping their investment of its unique constitutionally-guaranteed worth -- does not restrict or negate this individual Plaintiff's standing to aver his particularized harm.

Defendants further assert: "Plaintiff's concern about potential future default by the United States Government is a generalized grievance shared by virtually every member of the public, and thus not a proper basis for standing." Def.M.1.  It is true that the statute (on its face and by the Defendants' threaten enforcement actions) presently causes harm to many millions of individuals other than Plaintiff.  However, the quantum and breadth of the statute's present harm to others should not negate Plaintiff's standing to aver his own particularized harm.  Indeed, it is true that the statute and Defendants' enforcement actions threaten a domestic and global economic "catastrophe" – just as Defendants have repeatedly warned to Congress.  Neither does this fact negate Plaintiff's standing to aver his own particularized harm.  Otherwise, with legal impunity, the government would be able to violate any individual's constitutionally protected interests as long as it does so *en masse* so that the individual's harm becomes a "generalized grievance shared by virtually every member of the public."  This cannot be.

Defendants' dismissal memorandum also argues against Plaintiff's standing because of Plaintiff's expression of concern, and his related academic query, regarding possible litigation redress for many other individuals who suffer ongoing and future harm because of the debt ceiling threat.  Defendants reference Plaintiff's October 2013 commentary in the Huffington Post.com. Def.M.10 n.5.  Plaintiff stands firmly by those expressed concerns.  It is a matter of moral conscience that Plaintiff expresses his strong concern for those individuals who depend on government benefit payments for survival, yet are now repeatedly made fearful of a debt-ceiling

default caused by continued congressional recklessness.  Plaintiff was expressing the same

concern so often expressed by Defendant Secretary Lew, and many others, on behalf of

individuals whose Social Security and Veteran benefits are jeopardized by threat of a debt limit

enforcement. *See* Lori Montgomery and Zachary A. Goldfarb, *As Debt-Limit Deadline Nears,*

*Investors Show Growing Concern About a U.S. Default*, WASH. POST., Oct. 8, 2013,

http://www.washingtonpost.com/business/economy/investors-show-growing-concern-about-

debt-limit-crisis/2013/10/08/de33881e-3032-11e3-bbed-a8a60c601153_story.html

 Plaintiff's standing to challenge the debt limit statute's constitutionality, however, is

solely based on his actual and certainly-impending harm -- particularized injury -- to him as an

individual.  Plaintiff is a Treasury debt holder and investor who has been harmed in the recent

past, is presently being harmed, and will continue to be harmed by the debt ceiling statute's

facial violation of his *absolute expectation of security* in his Treasury investments.

As discussed below, Plaintiff is additionally harmed by the as-applied, actual violation of

Defendants' threat to arbitrarily enforce the statute.  And, Plaintiff is separately harmed by the

as-applied, certainly-impending violation of frozen accounts and assets during a default.  These

harms are also particularized to Plaintiff as an individual Treasury debt holder and investor.

III.	**Real, Impending Risk; Defendants Continue to Threaten Default and Banks
Spend "Many Millions of Dollars" to Prepare for the Imminent Default;
Plaintiffs Assets Will be Frozen in a Default.**

The Defendants assert throughout the memorandum that "the remote possibility of a

government default" is "highly improbable" and merely a product of Plaintiff's "anticipatory

speculation."  This assertion is patently inaccurate and is contrary to the repeated, publicly-stated

position and emergency extraordinary actions of Secretary Jacob Lew and Treasury Department.

The assertion is also contrary to marketplace reactions during recent debt limit breaches and actual government default near-misses, including large banks that spent "many millions of dollars" to prepare for the imminent default. David Henry and Lauren Tara LaCapra, *Insight: As U.S. Default Threatened, Banks Took Extraordinary Steps,* REUTERS, Nov. 19, 2013, available at http://www.reuters.com/article/2013/11/19/us-usa-fiscal-banks-warrooms-insight-idUSBRE9AI05P20131119. Indeed, the memorandum's erroneous assertion is contrary to the very title of temporary debt ceiling suspension legislation passed by Congress in November of last year: "The Default Prevention Act of 2013." *See* Continuing Appropriations Act, 2014, Pub. L. No. 113-46, 2013 H.R. 2275.

The memorandum's assertion contradicts Defendant Lew's many public statements that a government default was imminent. The assertion directly contradicts Defendant Lew's 2013 congressional testimony regarding a default's impending nature and its threatened "catastrophic" harm. Plaintiff suffers as-applied, actual (past, present, and ongoing) harm from Defendants' threats to arbitrarily enforce the debt ceiling. And, Plaintiff suffers additional separate as-applied harm from the real, certainly-impending risk of a debt-ceiling-caused default during which certain of his Treasury assets would be frozen and unavailable to him.

### A.  Defendants Threaten Imminent Default Caused by Debt Ceiling Enforcement.

After congressional partisans put the government in a shutdown for lack of future appropriations in October 2013, they then purposefully blocked the United States from honoring its obligations to pay for its past spending. The government's imminent fiscal default was threatened by Defendants and predicted by a range of neutral, nonpartisan commentators. The Treasury Department is still today warning of the "catastrophic" costs of such a default: Global credit markets will freeze, interest rates will skyrocket, and equity markets will plunge. Treasury

warns against "political brinksmanship that engenders even the *prospect* of such a default," and predicted that the default's macro-economic harm would last more than a generation. Treasury Report: The Potential Macroeconomic Effect of Debt Ceiling Brinksmanship, Oct. 3, 2013, available at

http://www.treasury.gov/initiatives/Documents/POTENTIAL%20MACROECONOMIC%20IMPACT%20OF%20DEBT%20CEILING%20BRINKMANSHIP.pdf.

As Plaintiff references in his first amended complaint, during testimony before the Senate Finance Committee, Secretary Lew's threatening message was unequivocal as to the danger of a default: "This brinksmanship threatens the holders of government bonds and those who rely on Social Security and Veterans benefits." *The Debt Limit, Hearings Before the Senate Committee on Finance*, 113th Cong. (2013) (testimony of The Honorable Jacob J. Lew, Secretary, United States Department of the Treasury).

### B. Defendant Lew Warns Treasury Bondholders.

In Defendant Lew's October 2013 appearance before the Senate Finance Committee, Defendant Lew explicitly stated that he could not give public debt holders assurance that they would be timely paid principal or interest on their investments.  Senator Pat Toomey asked Lew whether the security and validity of Treasury-issued debt, such as that held by the Plaintiff, was being questioned: "Are you prepared to assure us, but more importantly, the millions of Americans who are investors in U.S. Treasury securities and the entire American economy, that under no circumstances will you permit a missed payment on a U.S. Treasury security obligation?" *Id.*  Defendant Lew adamantly refused to give Treasury debt holders any such assurances.  Rather, Secretary Lew stated that "the only way to make sure we can pay all of our obligations is for Congress to act and raise the debt limit." *Id.*

In further testimony, Defendant Lew detailed the irrationality of suggestions that Treasury could prioritize its millions of automated daily payments in order to assure bondholders would remain whole: "This system was not designed to be turned off selectively.  Anyone who thinks it can be done just doesn't know the architecture of our payment system." *Id.*  Describing a circumstance in which the debt ceiling was fully breached, Lew stated: "It would be chaos" and "the options are all bad." *Id.*  Secretary Lew further explained:

> The legal issues even regarding interest and principle [*sic from transcription*] on the debt are complicated.  Let me remind everyone, principle [*sic*] on the debt is not something we pay out of our cash flow of revenues.  Principle [*sic*] on the debt is something that is a function of the market's rolling over.  So there's a question of what we can do as a government and how the markets function when the government is failing to pay all of its bills.  We've never been there and I think anyone who suggests they know exactly what that means would be projecting after 224 years of the history of paying all of our bills, what happens if we stop paying all of our bills.

*Id.*  In recent relevant commentary discussing the Prompt Payment Act, Professor Neil Buchanan helps explain the reason that the Treasury Department has consistently maintained that Treasury cannot legally prioritize its payments:

> Part of the reason that Treasury has rejected the broad suggestion that they can prioritize all spending…is that they are required by law to make payments on a day-to-day basis.  That is, even if they wanted to hold off on paying a lower-priority obligation that is due today, in anticipation of a higher-priority obligation that will be due tomorrow, they are required by law to pay for every obligation for which money is available, every day.  The relevant statute is the Prompt Payment Act, 31 U.S.C. 3901 *et seq*.

Neil Buchanan, *The Prompt Payment Act, the Meaning of Obligations and Debts, and Default*, DORFONLAW.ORG, Sept. 27, 2013, available at http://www.dorfonlaw.org/2013/09/the-prompt-payment-act-meaning-of.html.

During the Fall of 2013 and the Winter of 2014, Defendant Lew stated that the Executive has no "magic" options of minting platinum coins or holding fire sales of financial assets sufficient to avoid fiscal "default." *See e.g.*, *Transcript of Interview on CNN's State of the Union*

*with Candy Crowley*, Oct. 6, 2013, *available at*

http://cnnpressroom.blogs.cnn.com/2013/10/06/lew-congress-is-playing-with-fire-on-debt-ceiling/.

Plaintiff continues to suffer particularized, actual harm caused by the Defendants' presently-continued threats to arbitrarily enforce the debt ceiling, while acknowledging that the Executive has no option to avoid a full government default when the statute is enforced.  As long as the debt ceiling remains law, Plaintiff does indeed "have to worry" about the validity of public debt obligations which are continually subject to question by the debt ceiling statute.  Plaintiff separately suffers the threat of additional real, certainly-impending harm from the inevitable default occurrence.

As noted above, the February 15, 2014 amendment implementing another temporary suspension until March 16, 2015 explicitly restricted Defendants from taking certain measures relating to building cash reserves that might help delay default after the Ides of March, 2015. *See* "*Temporary Debt Limit Extension Act,*" Pub. L.  No: 113-83; S-540.  The debt limit statute now envisions and facilitates a debt default scenario.

Most recently, on May 7, 2014, the Defendant Treasury Department stated in a congressional communication, that while, it would be "technically capable" of continuing to make debt principal and interest payments even if it was not "making other kinds of payments" during a default, such capability was only based on Treasury having available cash reserves.  The Defendant emphasized that such an experimental act would "create unacceptable risk to both domestic and global financial markets."  The Defendant again restated "this would mean that the United States would default on its obligations, including to senior citizens, veterans, and members of the military." Tim Reid, *Treasury Says Debt Payments Could Be Prioritized In*

*Default Scenario*, Reuters, May 9, 2014, http://www.reuters.com/article/2014/05/09/us-usa-treasury-debt-idUSBREA480R520140509  Plaintiff asserts that even in the unlikely possibility that Treasury has such cash reserves in a default to temporally pay interest and principal, certain other of his TreasuryDirect.gov account assets would be frozen. Also, Treasury would not be able to repay the TSP G Fund assets in which Plaintiff has an interest.  Treasury regularly borrows money from TSP G Fund as an "extraordinary measure" to stave off an actual default when the debt limit is being breached.

### C. Defendants Take Emergency "Extraordinary Actions" to Prevent Default After Debt Limit Reached.

The Defendants' memorandum is also directly contrary to the emergency "extraordinary measures" repeatedly taken by Defendants to delay the default when the debt limit has been breached.  It is illogical to argue that Defendants would repeatedly expend substantial monies and energies for such "extraordinary measures" only for a "remote possibility" of a purely "speculative" default.  The measures were of an emergency and extraordinary nature because "catastrophic" government default was indeed imminent.  As noted above, one of the measures Defendant Treasury uses is to effectively borrow funds from federal employees' TSP retirement G Fund (of which Plaintiff has a legal interest putting Plaintiff in more risk as explained below).

The Plaintiff is left to the arbitrary mercies of Defendants to take such emergency measures, including borrowing from Plaintiff's interest in the TSP's G Fund, as they enforce the debt ceiling statute.  It is important to again reference that the latest congressional action on the debt ceiling, the Temporary Debt Ceiling Suspension Act of February 2014, explicitly restricted Defendants ability to mitigate and/or delay a resulting default from an enforcement of the debt ceiling statute.  The debt limit statue, as amended, now explicitly fosters and facilitates a default

upon its enforcement.  The *facial* constitutional violation of the debt ceiling statute was made
even more obvious.

### D.  Marketplace Prepares for Real, Imminent Default; "Many Millions of Dollars" Spent by Banks Preparing for Imminent Default.

As Plaintiff's first amended complaint references, independent organizations, such as the
Bipartisan Policy Committee, repeatedly warned that a debt-ceiling caused "default" was highly
probable by October's end, and a certainty by November 15, 2013. *See* Shai Akabas, Brian
Collins and Steve Bell, *As BPC's X Date Window Narrows, Economic Risks Grow*,
BIPARTISANPOLICY.COM, Oct. 8, 2013.   During the 2013 default crisis, some of the largest
investment houses openly eliminated their Treasury debt positions scheduled to mature in late
October and November 2013.  Smaller banks and investment firms reportedly advised clients to
sell short-term Treasury holdings.  On October 13, 2013, heads of the International Monetary
Fund and the World Bank publically implored Congress to take urgent action to lift the debt
ceiling, while warning that the projected and imminent default would result in global economic
catastrophe.  *See* Annie Lowrey and Nathaniel Popper, *World Leaders Press the U.S. on Fiscal
Crisis*, N.Y. TIMES, Oct. 13, 2013, at A1.  These actions were not borne of the Plaintiff's
speculative fear.

By any measure, the marketplace judged the validity of Plaintiff's holdings to be at risk
because of the debt ceiling enforcement.  On October 15, 2013, interest rates on commercial
interbank loans were lower than interest rates on Treasury bills.  The so-called "TED spread"
turned negative, evidencing that debt marketplace had more confidence in short-term commercial
interbank loans than in the United States Treasury's short-term debt.  Also on October 15, 2013,

a ratings firm, Fitch, placed the United States on a "Ratings Watch Negative," noting that the debt- ceiling crisis cast serious doubt on the creditworthiness of the United States.  Fitch announced that the debt-ceiling crisis "risks undermining confidence in the role of the U.S. dollar as the preeminent global reserve currency, by casting doubt over the full faith and credit of the U.S." *See* Howard Schneider, *Default Averted This Time, But Standoffs Have Put the U.S. Credit Rating at Risk*, WASH. POST., Oct. 17, 2013 at A10.

As noted above, the nation's largest banks took the default threat quite seriously, committing "millions of dollars" and other resources in planning for an imminent default.  As reported in November, 2013:  "As the United States threatened to default on its debt last month, major U.S. banks set up war rooms [and] spent many millions of dollars on contingency planning." David Henry and Lauren Tara LaCapra, *Insight: As U.S. Default Threatened, Banks Took Extraordinary Steps,* REUTERS, Nov. 19, 2013, available at

http://www.reuters.com/article/2013/11/19/us-usa-fiscal-banks-warrooms-insight-idUSBRE9AI05P20131119.

### E.  Congress Acts to (Temporarily) Prevent "Default" by Suspensions, But Plaintiff's Risk Exposure Extends Well Past March, 2015.

As Plaintiff references in his first amended complaint, it is telling that the suspension legislation of November 2013, by which Congress temporarily suspended the debt ceiling, was short-titled "The Default Prevention Act of 2013."  Congress acted to temporally prevent an imminent government default.  The Default Prevention Act's complex procedural method, crafted to implement the temporary suspension, reportedly known as the "McConnell Disapproval Rule" further disturbed and confused the market. *See* Annie Lowrey, *Lingering Confusion in Debt Ceiling Deal's Temporary Fix,* N.Y. TIMES, Oct. 17, 2013 at B3.  The "McConnell Disapproval Rule" procedure was designed to further cloak the debt ceiling's

operations, and Congress' continued fiscal recklessness.  The debt ceiling's unconstitutionality, however, cannot be hidden, nor can its ongoing and certainly-impending harms.

As noted above, when Congress enacted the subsequent debt ceiling suspension in February 2014, the legislation had new additional provisions that attempt to restrict Defendants' future discretion in mitigating the certainly-impending harm that will result from enforcement of the statute.  Section 3 of the amendment (styled "*Restoring Congressional Authority Over the National Debt"*) prohibits Treasury from prepaying obligations and/or building a "cash balance above normal operating balances in anticipation of the expiration of such period." Pub. L. No: 113-83; S-540.  Clearly, congressional drafters of the amendment were planning for and sought to establish advantage during the next debt ceiling default scenario.  The debt ceiling statute, as amended, now envisions and facilitates a default at the time of its enforcement.  The *facial* constitutional violation of the debt ceiling statute was made even more obvious.

Contrary to Defendants' memorandum's assertions, the Defendants' ongoing threat of statutory enforcement causes the Plaintiff present ongoing harm.  Separately, the real risk of a government default from such enforcement fully satisfies the probability requirements of the Supreme Court's imminence test. *Lujan v. Defenders of Federal Wildlife*, 504 U.S. 555 (1992). The "purpose" of "imminence" is "to insure that the alleged injury is not too speculative for Article III purposes – that the injury is *certainly-impending*." *Id.* at 565 n.2.  While imminence does not mean with an absolute certainty, there is no doubt to any reasoned person that a default will occur when the statute is enforced.  Contrary to Defendants' dismissal memorandum, Plaintiff avers a certainly-impending, real threat as described below -- not a "speculative chain" of possibilities.  Plaintiff's holdings carry such long maturities, or will restricted, such that Plaintiff will be directly affected by a default happening after March 15, 2015.

Plaintiff's marketable holdings (5-year, 7-year, 10-year and 30-year) were purchased at various times on or after January 2013 and are of sufficiently long duration to carry well past March 2015. Other of Plaintiff's shorter maturity holdings purchased at various times on or after January 2013 (4- week, 13-week, 52-week) are held with automatic re-investment scheduled -- reinvestments which carry them well beyond the March 16, 2015 suspension date. And, Plaintiff continues to purchase TreasuryDirect.gov holding of varied durations that carry their maturities well beyond March, 2015. Plaintiff also avers legal interest in his spouse's TSP account in which a predominant percentage of the sizeable assets are held in the G Fund. (Plaintiff's spouse, however, is not a party in any way to this litigation). Plaintiff holds a percentage of his TIAA-CREF retirement account assets in an Inflation Bond Fund directly holding a substantial percent Treasury securities.

### F. Plaintiff is Subjected to Direct Risk of Harm; Particular Accounts and Assets Will be Frozen.

It is first important to emphasize that Plaintiff's *nonmarketable* TreasuryDirect.gov purchased Savings Bonds and his Treasury Direct.gov Certificate of Indebtedness account could never be redeemed or liquidated during a government default. A default would at minimum freeze Plaintiff's access to these assets causing substantial harm. As Defendants' memorandum acknowledges, the savings bonds are not available to be traded by Plaintiff in a secondary market. The risk to Plaintiff in a default is real and actual – certainly not "speculative" nor part of a "speculative chain" of events. The Treasury Direct.gov Certificate of Indebtedness account is also subject to holding restrictions after certain funding contingencies. And, adding to that risk, the Plaintiff's savings bond investments are subject to a full years holding period, so at least part of Plaintiff's saving bond holdings cannot be redeemed -- until well after the temporary suspension ends after March 15, 2015. Thus, a default would totally eliminate Plaintiff's access

26

to these assets.  As Plaintiff will aver in the Second Amended Complaint if Court is granted to file, he also has actual and certainly-impending as-applied harm as the TSP G fund (of which he has a spousal interest) would be frozen in the risk of a default resulting from enforcement of the debt ceiling.  It is well known that Defendants use the TSP G Fund as a "extraordinary measure" account from which Defendants borrow to avoid an actual default.  This practice turns Plaintiff's interest in the TSP G Fund account into additional government debt owed to Plaintiff.  *See* Fred Smith, *Borrowing from the G Fund (Again) to Offset the Debt Ceiling*, FedSmith.com, Feb. 5, 2014, available at http://www.fedsmith.com/2014/02/05/borrowing-from-the-g-fund-again-to-offset-the-debt-ceiling/.  Plaintiff suffers similar risk in the percentage of his TIAA-CREF retirement account held in the TIAA-CREF Treasury Inflation Bond Fund.  The liquidity of these assets would be directly impacted by default.

In a default, the scheduled "reinvestment" of Plaintiff's shorter term maturities will be disrupted (as Treasury would be not be allowed to borrow money above its limit – that is sell Plaintiff the bill again) however at the same time, Treasury would not have guaranteed cash reserves to redeem the bills.  This is of particular concern and likelihood for the 4-week bills, which are regularly coming due.  Plaintiff would be directly damaged by this disruption.

Contrary to speculation in Defendants' dismissal memorandum, it is also highly probable that one or more of Plaintiff's marketable Treasury holdings will come up for interest payment or scheduled redemption, during a government default.  The risk that Plaintiff's marketable debt will come due for reinvestment, redemption, or interest payment during a default is high.  Additionally, as the Plaintiff purchases all his Treasury instruments from TreasuryDirect.gov, the bills, notes and bonds all carry a 45-day minimum holding period, so the risk that a default would occur within such a 45-day hold period when such holdings are not

marketable makes the threat more probable.  And, as discussed above, Plaintiff would be substantially harmed by a default, as access to his savings bonds and Certificate of Indebtedness account would be effectively frozen, and would directly impact liquidity of retirement accounts interests predominantly holding Treasury securities.

On the factual foundation of the Defendants' increasingly dire warning about an imminent government default resulting from their enforcement of the debt ceiling (as well as the warnings of experts and the best knowledge of the marketplace), the averred harm of a government default as a result of the Defendants' debt ceiling statute enforcement is certainly-impending and obviously particularized to Plaintiff as a TreasuryDirect.gov account and retirement account holder.

## IV.  Plaintiff Should Not be Forced to Sell Treasury Bonds to Eliminate Harm from the Unconstitutional Debt Ceiling; Plaintiff Chooses to Invest in America.

Perhaps the most troublesome aspect of the dismissal memorandum to Plaintiff  --who proudly purchases and holds his Treasury holdings as an investment in America -- is its assertion that Plaintiff could avoid his injury by preemptive selling that investment.  Defendants argue that "in the hypothetical and highly improbable event" of a government default, whether or not Plaintiff is affected is dependent on whether Plaintiff continues to hold those securities at the time is "a contingency within Plaintiff's own control."Def.M.8-9.  Defendants thus imply that Plaintiff could simply sell his marketable Treasury securities to avoid harm resulting from the unconstitutional debt limit statute.[8]

---

[8] Again, Plaintiff's savings bonds and Certificate of Indebtedness account are not tradable on a secondary market.

Analogies to other *facial* constitutional violation *contingencies* within a plaintiff's control should be considered for their comparative value: If an African-American parent would stop asking for their child's admission to a whites-only segregated public school, there could be no Fourteenth Amendment  equal protection harm *facially* inflicted by a state's separate-but-equal statute.  If a plaintiff would just stop practicing his religion, there could be no First Amendment free exercise harm *facially* inflicted by Congress banning his evangelical faith.  If a racial minority plaintiff would stop attempting to vote, there would be no Fifteenth Amendment voting rights harm *facially* inflicted by statutory franchise racial restrictions.  If a citizen plaintiff would just stop making domestic telephone calls or sending domestic emails, there could be no Fourth Amendment search harm *facially* inflicted by a statute empowering unnamed government agents to capture and filter his personal communications without a particularized warrant.

Defendants suggest that because Plaintiff could sell his Treasury holdings, there should be no standing to aver his Fourteenth Amendment Public Debt Clause harm (actual or certainly-impending) possible.  As referenced in the Plaintiff's first amended complaint, buying and holding his nation's public debt is not only done as an investment option because of its uniquely secure worth, but also as a patriotic act of civic engagement on the same order as electoral participation.  Proudly during peaceful times and humbly during times of war, individual American citizens have held American debt – albeit often in relatively very small amounts.

Throughout America's history, citizens' purchasing and holding of government bonds has been seen a profoundly patriot act.  As our first Treasury Secretary, Alexander Hamilton, said in 1790, "United States debt, foreign and domestic, was the price of liberty."  Adam Hodge, *Remembering The Fathers of the Treasury*, June 16, 2013, *available at* http://www.treasury.gov/connect/blog/Pages/remembering-_fathers.aspx.  Particularly during

times of war, our government has used a variety of media campaigns to promote the patriot act of

bond buying and to educate all as to the purpose of public debt.  For example, after the repeated

campaigns to promote bond purchasing during World War II, entertainer Bing Crosby sang in

1946 that "We've got another bond to buy," explaining: "You may think the war is won, but we

can't leave the job half done.  The boys have seen it through.  Now the rest is up to you.  Yes,

we've got another bond to buy."[9]

       The Plaintiff, as an individual investor and citizen-bondholder, chooses not to liquidate or

even partially dilute his Treasury securities, his TIAA-CREF account Treasury Bond holdings,

nor his interest in the TSP G Fund assets, in order to avoid or mitigate the unconstitutional debt-

ceiling statute's ongoing actual harms or future certainly-impending harms.  While the Plaintiff

may rebalance funds from his Treasury Certification of Indebtedness core account or, due to

extreme financial exigency, choose to sell Treasury investments, the Plaintiff should certainly

not be forced to sell his investment in America for the purpose of avoiding the certainly-

impending harm of the unconstitutional debt limit statute.

## V.      Unconstitutional Debt Ceiling Is Ripe for Review.

       As a separate but related jurisdiction challenge, the Defendants' memorandum attempts

to further challenge this Court's jurisdiction by describing the Plaintiff's action as not ripe for

adjudication.  First, it is important to underline that the ripeness doctrine has an unique

---

[9] American citizens patriotically responded to the call to finish the job – including with debt to finance rebuilding our post-war infrastructure and launching the Marshall Plan – thus laying the foundation for developed world prosperity for future generations. *See* lyrics and hear audio for Official Victory Loan Song: We've Got Another Bond to Buy, (CC) available at http://www.authentichistory.com/1939-1945/3-music/03-Defense/19460000_Weve_Got_Another_Bond_To_Buy-Victory_Loan_Song-Bing_Crosby.html

application to the declaratory judgment review that Plaintiff requests pursuant to the Declaratory

Judgment Act, 28 U.S.C. § 2201.  The Declaratory Judgment Act provides that "[i]n a case of

actual controversy within its jurisdiction ... any court of the United States ... may declare the

rights and other legal relations of any interested party seeking such declaration, whether or not

further relief is or could be sought." 28 U.S.C. § 2201(a).  In *MedImmune, Inc. v. Genentech,*

*Inc.,* 549 U.S. 118 (2007), the Supreme Court stated that in a declaratory judgment action,

"where threatened action by *government* is concerned, we do not require a plaintiff to expose

himself to liability before bringing suit to challenge the basis for the threat— for example, the

constitutionality of a law threatened to be enforced." *Id.* at 129 (emphasis in original).  Plaintiff

seeks a declaratory judgment as to the *facial* unconstitutionality of the debt ceiling statute, and

separately as to the as-applied unconstitutionality of Defendants threat to enforce the statute, and

finally to the unconstitutionality of the actual enforcement of the statute.  The action is fully ripe

for this Court's declaratory judgment review.

Plaintiff further asserts below that this challenge to the unconstitutional debt ceiling is

also fully ripe for this Court's review of  Plaintiff's separate but related request for an injunctive

(or mandamus) remedy.  First, it is important to again state that the Plaintiff faces ongoing,

concrete and particularized harm from the *facial* violation by the statute, and actual, as-applied

injury from Defendants' continued threat of arbitrary enforcement of the statute.  This claim of

actual harm, based on a full factual record of the Defendants' own making, makes ripe the

action's review of the equitable remedy request.

Plaintiff separately suffers direct, certainly-impending harm from risk of a

debt-ceiling-caused default.  Defendants make frequent reference to *Lujan v. Defenders of*

*Federal Wildlife*, 504 U.S. 555 (1992), throughout their arguments, attempting to discount the

known certainty that a default will be caused by debt limit enforcement.  The Supreme Court in *Lujan,* however, stated that imminence is relevant to justiciability only insofar as it relates to the probability that harm will occur. *Id.* at 565 n.2.  Defendants have spent over three years repeatedly and publically building a factual record describing why default harm is not just highly probable -- but is certain to occur -- when the debt ceiling statute is enforced.

### A.  Plaintiff's Claims of Past, Ongoing Present and Future Harm Are Ripe for Review.

The past, ongoing, and certainly-impending harm suffered by Plaintiff is reviewable.  The debt ceiling statute was not repealed, but rather, was only temporarily suspended in February 2014.  Like a harmful bacterial infection lightly treated and suspended for a time, but not actually killed, the debt ceiling will come back more dangerous and more harmful than before.  Indeed, Congress' short title of the temporal legislation makes the point: "Temporary Debt Limit Extension Act."

The February 2014 suspension of the debt ceiling was widely reported as a strategic partisan move to defer the ultimate default battle until the next congress -- after expected GOP Senate victories in the midterm elections. *See e.g.,* Carl Hulse and Jonathan Martin, *Retreat on Debt Fight Seen as GOP Campaign Salvo*, N.Y. TIMES, Feb. 17, 2014, available at http://www.nytimes.com/2014/02/18/us/politics/behind-debt-limit-retreat-a-gop-eye-on-retaking-the-senate.html?_r=0

While ongoing debt default threats should be unacceptable, they have become an integral part of governance process and electoral campaigns. *See* Peter Weber, *The End of the Debt Ceiling Brinkmanship Should Make You Nervous,* THE WEEK, Feb. 12, 2014, http://theweek.com/article/index/256302/the-end-of-debt-ceiling-brinkmanship-should-make-

you-nervous.  The specter of congressional leaders strategizing about how to best and most strategically lodge threats to the validity of the nation's public debt is shameful regular order in our present age of asymmetric partisan polarization.

Although the 2014 suspension amendment was widely misreported as having been "a clean debt limit bill," as noted above, the legislation in fact had novel provisions that presently restrict Defendants' discretion in mitigating the certainly-impending harm that will result from enforcement of the statute.  Section 3 of the suspension legislation (styled "*Restoring Congressional Authority Over the National Debt*") prohibits Defendant Treasury from prepaying obligations and/or building a "cash balance above normal operating balances in anticipation of the expiration of such period." Pub. L. No: 113-83; S-540.  The debt limit statute, as amended, now actually envisions and facilitates a default scenario at the time of its enforcement in ten months.  Contrary to assertions in Defendants' memorandum, the 2014 temporary suspension legislation does not prevent Plaintiff's actual injuries, or affect this litigation's ripeness as its temporal nature is obvious.  And, the suspension language amends the debt limit statue to foster such a harmful default.

It is again important to emphasize that Plaintiff's *nonmarketable* TreasuryDirect.gov purchased Savings Bonds and his Treasury Direct.gov's Certificate of Indebtedness account could never be redeemed or liquidated during a government default.  And, adding to that risk, as savings bond investments are subject to a full years holding period, part of Plaintiff's saving bond holdings cannot be redeemed until after the temporary suspension ends on March 16, 2015.  Also adding to the ongoing risk of doing business with TreasuryDirect.gov – under the cloud of a threat of default from the statutory enforcement– is the fact that when funds are deposited by Plaintiff into his Certificate of Indebtedness account –as  debited from his financial institution –

the *total* account balanced is restricted to a holding period.  At a minimum level of harm, Plaintiff's saving bond and Certificate of Indebtedness assets will be frozen in a default.  Plaintiff's TIAA-CREF Treasury holdings and his interest in TSP G Fund assets are similarly put in likely certainty of illiquidity.

Again, rather than being only hypothetical harm in a "speculative chain of possibilities" as erroneously asserted by Defendants, it is certainly-likely that one or more of Plaintiff's marketable Treasury holdings will come up for interest payment, redemption, and/or scheduled reinvestment during a government default.  Plaintiff's Treasury marketable holdings (5-year, 7-year, 10-year and 30-year) were purchased on or after January 2013 and are of sufficiently long duration to carry well past March 2015.  Other of Plaintiff's shorter maturity holdings purchased at various times since January 2013 (4- week, 13-week, 52-week) are held with automatic re-investment scheduled.  This reinvestment carries them well beyond the March 15, 2015 suspension expiration date.  Reinvestment timing for the 4-week bills would be highly probable during a default; as explained above, Treasury would neither be able to resell the bills to Plaintiff as it would not be allow to borrow, nor be able to redeem the bills as it would not have available cash reserves.

As the Plaintiff's first amended complaint details, only this Court's exercise of Article III equitable jurisdiction for injunctive or mandamus remedy can provide redress for the immediate and the prospective remedy required to both end the continuing harm and prevent future harm.

This action has parallels to *Bowen v. Massachusetts,* involving a federal agency's prospective renunciation of advance payments for a state Medicaid program. 487 U.S. 879, 905 (1988).  The Supreme Court ruled in *Bowen:*

> The State's suit to enforce the Medicaid Act, which provides that the Secretary "shall pay" certain amounts for appropriate Medicaid services, is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.

*Id.* at 900.  Plaintiff's instant action is about enforcing the constitutional guarantee itself that the validity, integrity and security of Plaintiff's Treasury holdings will not be subject to questioning by the nation's government.


B. **Plaintiff Will Suffer Substantial Hardship by "Prudential" Delay in Reviewing; Waiting for a "Catastrophic" Default Is Most Imprudent.**

`          The Defendants' memorandum suggests that "prudential" concerns should lead this Court to delay its review of Plaintiff's claims.  If review of this claim is deferred, Plaintiff will suffer substantial hardship, as the *facia*l harm is presently ongoing.  Separately, Plaintiff continues to suffer ongoing harm from the Defendants' continued threats to arbitrarily enforce the statute.  And, the Plaintiff's separate harm suffered by real risk of such a certainly-impending default trumps any prudential argument.

If review of this claim is deferred until after a debt-ceiling-caused default – when a bankrupt Treasury unable to pay interest or pay redemptions -- Plaintiff's hardship will be substantial.  Again, Plaintiff's access to his savings bond and Certificate of Indebtedness account assets would be essentially eliminated in a default.  As the Justice Department's Judgment Fund would also become bankrupt, Plaintiff would be without adequate judicial recourse *ex post.*

Only this Court, exercising Article III authority, can grant adequate declaratory and equitable relief.  The Executive does not have legal authority to provide the Plaintiff recourse.  As Plaintiff's first amended complaint references, Professors Neil Buchanan and Michael Dorf quite persuasively describe how the debt ceiling's operation traps the Executive in an unconstitutional "trilemna." Neil H. Buchanan & Michael C. Dorf, *Borrowing by Any Other*

*Name: Why Presidential "Spending Cuts" Would Still Exceed the Debt Ceiling*, 114 COLUM. L. REV. SIDEBAR 44 (2014), http://www.columbialawreview.org/Borrowing-by-any-other-name_Buchanan-and-Dorf.

The debt ceiling statute makes the President choose which of his three fiscal statutory duties he must violate – spending, taxing, or borrowing.  In their recent academic work on the subject, Buchanan and Dorf expand their analysis to clearly detail how operational default is actually "a more dangerous, less effective, and more unconstitutional method of violating the debt ceiling." *Id.*  Professors Buchanan and Dorf explain:

> A presidential decision to default on the government's obligations would necessarily violate the Constitution in one of two ways (in addition to usurping Congress's spending power).  Either that default would increase the debt, violating Article I Section 8, or that debt would have to be immediately repudiated, violating Section 4 of the Fourteenth Amendment.

*Id.*  Professors Buchanan and Dorf acknowledge the extra-legal aspect of the least illegal Executive action.

While temporally suspended, the debt limit statute remains an unconstitutional exercise of legislative authority.  In both its text and intended operation, the statute always questions the validity of the public debt to the Plaintiff's varied harm.  Plaintiff submits that only this Court can legally end Plaintiff's present and ongoing harm, and only this Court can prevent the certainly-impending harm.  Only this Court's invocation of an equitable remedy -- after granting a declaratory judgment that the statute is unconstitutional and void – can provide redress from the harms.

Finally, Plaintiff respectfully submits that it would be most *imprudent* for this Court to delay review of this action until after a debt-ceiling caused "catastrophic" government default.

**Conclusion**

For all the foregoing reasons, Plaintiff submits that the Defendants' motion to dismiss should be denied.

Most respectfully,

/s/Victor Williams (for himself)
(DC Bar No. 428505)

Faculty Suite 480
Columbus School of Law
Catholic University of America
3600 John McCormack Road, N.E.
Washington, D.C.  20064
williamv@law.edu
202-319-5559

Residence:
5209 Baltimore Ave
Bethesda, MD 20816